MORAY v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 3675.  Decided July 9, 1921.  (199 Pac. 1023.)

1. MASTER AND SERVANT—COMPENSATION FOR BOTH TEMPORARY AND PERMANENT DISABILITY LEFT TO JUDGMENT OF COMMISSION. While there may be instances where awards should be made for both temporary and permanent disability, such questions should, to a large extent, at least, be left to the judgment of the Industrial Commission, especially where the nature, extent, and real cause of the particular injury, as loss of vision, are in doubt.

2. MASTER AND SERVANT—COMPENSABLE INJURY TO EYE HELD NOT A PERMANENT TOTAL DISABILITY NOR A LOSS NOT OTHERWISE PROVIDED FOR. The provisions of Comp. Laws 1917, §§ 3138, 3139, as amended by Laws 1919, c. 63, allowing compensation for injury in cases not otherwise provided for, and in cases of permanent total disability, held without application to the case of injury to the vision of an employé from an electric flash.

3. MASTER AND SERVANT—HYSTERICAL CONDITION ELEMENT OF COMPENSATION. Where a hysterical or nervous condition in the injured employé was present, which was caused by the accident, such condition must be considered in fixing the time for which compensation should be allowed where the Compensation Act itself does not fix the time and amount to be awarded, but the Commission should not award compensation for a nervous condition not caused by the accident which is merely mental, and which will disappear when the mind is at ease.

4. MASTER AND SERVANT—COMMISSION ALLOWING LESS THAN MAXIMUM COMPENSATION FOR TEMPORARY DISABILITY MUST FIX TIME. In the case of temporary disability of an injured employé, the Compensation Act only fixes the maximum time for which compensation may be allowed, and if the Commission is convinced that less than the maximum should be allowed they must fix the time.

5. MASTER AND SERVANT—COMMISSION'S FINDINGS IN COMPENSATION

Certiorari.  Award Affirmed

CASE FINAL. All the Supreme Court is authorized to do in a compensation case is to determine whether the Industrial Commission has exceeded its authority in disregarding the law or in making findings and conclusions not supported by substantial legal evidence; if the Commission has not done so, the court cannot interfere, regardless of whether it does or does not agree with the Commission's findings and conclusions.

6. MASTER AND SERVANT—INDUSTRIAL COMMISSION MAY CLOSE COMPENSATION CASE OR KEEP IT OPEN. Under Comp. Laws 1917, § 3144, of the Workmen's Compensation Act, the Industrial Commission has the power either to close a case or to keep it open for further consideration.

7. MASTER AND SERVANT—COMPENSATION FOR PARTIAL PERMANENT LOSS OF VISION ADEQUATE. Award by the Industrial Commission to an employé who had sustained a loss of vision through an electric flash equal to 10 per cent. in one eye and 5 per cent. in the other, of a 15 per cent. allowance for 15 weeks of the authorized allowance of 100 weeks for total permanent loss of vision in one eye *held* adequate, if not more than employé was entitled to, for the permanently defective vision.

8. MASTER AND SERVANT—SPECIFIC FINDINGS NOT REQUIRED IN COMPENSATION CASE. There is nothing in the Workmen's Compensation Act requiring the Industrial Commission to make specific findings, and, though it should make findings on all the questions of fact, it is not required to do so.

Proceedings for compensation under the Workmen's Compensation Act by Thomas H. Moray, the employé, opposed by the Mountain States Telephone & Telegraph Company, the employer. Compensation was awarded by the Industrial Commission, and the employé applies for review of its findings and decision for insufficiency of compensation.

PROCEEDING DISMISSED, and award of Commission AFFIRMED.

*D. M. Draper*, of Salt Lake City, for plaintiff.

*Harvey H. Cluff*, Atty. Gen., and *J. R. Robinson*, Asst. Atty. Gen., for defendants.

FRICK, J.

The plaintiff makes application to this court for a review of the findings and decision of the Industrial Commission of Utah, hereinafter called Commission.

In his application it is alleged that the Commission exceeded its powers in the following particulars (1) That total temporary disability having been established by the uncontradicted evidence, the Commission exceeded its authority "in refusing to find such disability and to make an award thereon"; (2) that, having found "that plaintiff suffered permanent loss of vision to the extent of 15 per cent. the Commission should have awarded compensation in proportion to compensation in other cases as provided in section 3138, c. 63, Laws Utah 1919, which it did not do;" and (3) section 3138, supra, provides that where the injury causes partial disability for work the employé shall receive compensation while such disability continues, and that such compensation shall be in addition to the scheduled awards for loss of members and bodily function, and, as shown by the record, the plaintiff is partially disabled for work, and therefore entitled to compensation as provided by said section."

We at this point insert sections 3138 and 3139 for the purpose of assisting the reader in obtaining a better understanding of the grounds upon which plaintiff bases his application for a review of the Commission's findings and decision.

Section 3138, as amended by chapter 63, Sess. Laws Utah 1919, so far as material here, reads as follows:

"Where the injury causes partial disability for work, the employé shall receive, during such disability and for a period of not to exceed six years, beginning on the fourth day of disability, a weekly compensation equal to 60 per cent. of the difference between his average weekly wages before the accident and the weekly wages he is able to earn thereafter, but not more than $16 a week. In no case shall the weekly payments continue after the disability ends, or death of the injured person and in case the partial disability begins after a period of total disability the period of total disability shall be deducted from such total period of compensation. In the case of the following injuries the compensation shall be 60 per cent. of the average weekly wages, but not more than $16, to be paid weekly for the periods stated against such injuries respectively and shall be in addition to the compensation hereinbefore provided for temporary total disability, to wit.  *  *  *"

Certiorari.   Award Affirmed

A statement of the number of weeks that allowances shall be made for specific injuries follows the foregoing quotation. We omit the statement, except two of the items which relate to injuries to the eyes, which are as follows: "One eye by enucleation, 120 weeks; total blindness of one eye, 100 weeks." The section concludes as follows:

"Any other disfigurement, or the loss of bodily function not otherwise provided for herein, such period of compensation as the Commission shall deem equitable and in proportion to compensation in other cases, not exceeding 200 weeks.

"The amounts specified in this section are all subject to the limitation as to the maximum weekly amount payable as hereinbefore specified in this section, and in no event shall more than a total of $5,000.00 be required to be paid."

Section 3139 reads:

"In cases of permanent total disability, the award shall be 60 per cent. of the average weekly wages for five years from date of injury, and thereafter 45 per cent. of such average weekly wages until the death of such person so totally disabled, but not to exceed a maximum of $16.00 per week and not less than a mimimum of $7.00 per week. The loss of both hands or both arms, or both feet or both legs, or both eyes, or any two thereof, shall constitute total and permanent disability, to be compensated according to the provisions of this section."

The plaintiff, in his application to the Commission, alleged that he suffered injury to his eyes from "shock to optic nerve" caused by an "electric flash from a high-tension current" on December 21, 1920, and that he suffered a "relapse March 1, 1921." The evidence is conclusive that there was an "electric flash," as alleged by plaintiff, and that his eyes were injured thereby. The evidence is also clear that his vision is affected in both eyes. Whether the defective vision was caused by said electric flash, or whether it was partly caused thereby, or was partly or wholly caused from astigmatism, and whether the astigmatism was also caused by said flash, or whether plaintiff was afflicted with it before the accident, and whether the same is permanent, or whether his defective vision is due to nervous disturbance and is merely temporary, are all questions which are left in doubt. It is difficult to determine, therefore, whether plaintiff's defective

vision is permanent or whether it is merely temporary. The facts that his eyes are affected with astigmatism and that at the time of the hearing and for some time prior thereto he was afflicted with hysteria, make the case still more complicated. There is no evidence whatever of the relapse.

One of the specialists, Dr. Irvine, who made a number of examinations of plaintiff's eyes, covering a period of several months commencing immediately after the accident, in substance testified that he first examined plaintiff on December 26, 1920, or within five days after he had received the shock from the electric flash; that he had examined plaintiff's eyes "three or four times"; that plaintiff came to the doctor's office on December 26th aforesaid complaining that his "eyes smart, vision blurs, when he reads—eyes water and itch." The witness said: "There was no other complaint. The plaintiff stated that he 'got an electric flash in his eyes.'" The doctor further said:

"Examination of his eyes at that time found no evidence of external injury or burns, action was ordinary in both eyes. There was found, in complete examination of eyelids and eyeballs, both internally and externally, no evidence of pathology. His vision * * * would be 90 per cent. in his right eye and 95 per cent. in his left eye."

The doctor further said that plaintiff's eyes "turned out," that is, "diverged," 20 degrees.

"A measurement of his eyes showed one-half a dioptre of astigmatism in both eyes, meaning his eyeball was a little bit longer in diverted axis. With his correction of his glasses he got 20/20 vision, which is 100 per cent. in both eyes."

The doctor also said that on the first examination he found that the normal blind spots in plaintiff's eyes were considerably increased, but that on a later examination, on February 21, 1921, the blind spots were normal again. There was, however, what the doctor calls an additional blind spot in the left eye which was "still there." The doctor further testified that at the time of the hearing the plaintiff, with glasses, had 100 per cent. vision; that the astigmatism in plaintiff's eyes made it necessary for him to continue wearing glasses; that in the opinion of the doctor the electric flash did

not cause the astigmatism; that there are very many people who should wear glasses to correct eye defects but do not do so, and who do not know of the defects in their eyes until later on in life; that in the opinion of the doctor plaintiff was afflicted with astigmatism before the accident, and that the astigmatism was not caused by the electric flash.

It also appeared that the plaintiff had served in the army during the late war, that his eyes had been examined by an army surgeon before plaintiff entered service. As to that, the doctor said that one could be examined for the army and the astigmatism not discovered; that the doctor himself had served as an eye examiner for the government and that such defects as plaintiff had would not necessarily be noticed, and that plaintiff could have served in the army with the astigmatism. The doctor further said: ''My conclusion is that this patient's (plaintiff) complaint is largely due to nervous disorder or hysteria, and in time will become normal;'' that the hysteria ''could be [caused by] any kind of shock''; that the doctor did not know whether the shock produced the defective vision. He said:

"I can hardly conceive that the shock could produce the astigmatism, but even during all his worry his vision with his correction [glasses] is normal. * * * but the very fact that the blind spots became less and less in size makes it evident that there must have been some nervous disorder."

The doctor also said:

"I couldn't possibly state definitely that his astigmatism could be due to any nervous disorder. Astigmatism is a change in the shape of the eyeball."

The doctor further testified that worry was the cause of hysteria, and, in his experience, when the cause for the worry was removed the hysteria also disappeared.

Another eye specialist was examined, and upon the main features agreed with the statements we have just recorded. He, however, said that it was possible that an electric flash and consequent shock might produce astigmatism. He could not say, however, whether plaintiff's astigmatism was thus caused. This specialist, however, fully concurs in the opinion that plaintiff's ailment was hysterical, and that there was no

physical injury to his eyes discovered. This specialist was asked, "What is the usual cause of hysteria?" and he answered: "It is a mental condition that may be due to worry, injury, or shock," and further testified that loss of vision may result "if they worry about anything." With regard to the astigmatism he further said that in his judgment the squint in plaintiff's eyes "is due to hysteria, and a relaxation will change the position of the eyeball."

In addition, there is considerable evidence from lay witnesses with regard to plaintiff's conduct and what he did shortly after the accident. There was evidence to the effect that plaintiff could do, and did, the same kind of work after the accident that he did before; that his sight did not seem affected. There is also evidence to the contrary. Much of the evidence from the lay witnesses is wholly irrelevant and immaterial.

After the evidence was concluded, one of the commissioners said: "The Commission would like to have the applicant examined by an independent specialist," and asked the parties to stipulate that such might be done, which they did. The specialist, on April 14, 1921, after making an examination of the plaintiff, made the following report:

"With reference to the case of T. R. Moray, I have made several examinations to see whether his statements correspond and I find as follows: Vision in right eye 20/100 indistinct; vision in left eye 20/90. Vision wearing his correction: Right eye, 20/50; left eye, 20/ 45. He has an exiphoria of 15 degrees. There is a slight conjunctivitis of both eyes. The cornea is perfectly transparent on both sides, pupils are normal, and react well to light and accommodation. I worked out his refraction and find a little more than half a dioptre of astigmatism in right eye and a little less in left. Lens and vitreous perfectly transparent in both eyes and fundus normal. On the whole I can't find anything showing to account for his stated loss of vision, so am forced to conclude that it is hysterical."

By keeping in mind the statements of the specialists of the nature of the alleged injury, it must be apparent to everyone that the testimony of the lay witnesses can be given little, if any, effect in this case. If there were no expert evidence, as a matter of course, some conclusion would have to be reached

by inferences and deductions from such evidence as was available.  Such, however, is not the case here.  Here, in view of the very complete examination and statements of the specialists, the only way that an intelligent result can be reached is by considering the examinations, reports, and statements of the specialists, who alone were qualified to make accurate and detailed statements respecting the condition of plaintiff's eyes.

Counsel for plaintiff, as we understand them, insist that the Commission should have awarded plaintiff compensation for both temporary disability and partial permanent disability.  While there may be, and no doubt are, instances where awards should be made for both temporary and permanent disability, that question, in our judgment, should, however, to a large extent at least, be left to the judgment of the Commission, and especially where, as here, the nature, extent, and real cause of the loss of vision are in doubt.  The Attorney General, who represents the Commission, however, contends that this case falls within the class of injuries for which the compensation is specifically provided, and hence there is no alternative, but the Commission, in view of their finding, was required to make the award they did make in this case, which is that the plaintiff be awarded $16 a week for 15 weeks, or a total sum of $240.  The Commission arrived at that result as follows: They found plaintiff had sustained a permanent loss of vision equal to 15 per cent. in one eye; that if plaintiff had sustained a total permanent loss of vision in one eye the maximum that should have been allowed under the statute would have been 100 weeks, and hence a 15 per cent. loss authorized a 15 per cent. allowance of what a total loss would authorize, which is 15 weeks.  We shall refer to this question again later.

As we understand counsel for plaintiff, however, they insist that plaintiff should receive compensation for permanent disability, as contemplated by Comp. Laws Utah 1917. § 3139, and, in addition, also be awarded for temporary disability during such time as temporary disability continued.

Upon the other hand, the Attorney General contends that

the Commission allowed such compensation as the statute contemplates. He insists that this is not a case of "any· other disfigurement, or the loss of bodily function not otherwise provided for herein," for which compensation is to be awarded as contemplated in section 3138, but that this is a case where specific compensation is provided for.

In our judgment, section 3139 has no application 2 here. Nor has the clause just quoted from section 3138.

As already intimated, however, the case presents some difficulties by reason of the temporary hysterical or nervous condition of plaintiff. It is further complicated by the fact that there is no doubt that plaintiff was afflicted with astigmatism in both eyes, which according to the testimony of the eye specialists, however, is not an uncommon thing, causing. defective vision, and from which many may suffer for a considerable length of time without being aware of it. It seems to us that plaintiff's counsel have, in part at least, overlooked the real conditions which are present in//this case. While it is true that there is no doubt that an accident occurred which affected plaintiff's eyes, yet it is also beyond dispute that his, eyes were thoroughly examined and tested not only once by one specialist but at several times, covering a period of several months, by several specialists, all of whom, plaintiff's counsel concede, were well qualified to make such examinations and tests; that, while the examinations and tests disclosed that plaintiff's vision was defective in both eyes, they nevertheless also disclosed that no physical injury to the eyes either external or internal was present; that plaintiff had astigmatism in both eyes, and that the astigmatism caused his defective vision; that he was also afflicted with a certain hysterical or nervous condition, which all the specialists agree aggravated or increased his defective vision; that, to say the least, it is very doubtful whether the astigmatism was caused or merely aggravated by the electric flash, or whether it existed prior to the accident; that if it was caused, or merely aggravated, by the electric flash, in the opinion of the specialist in whose judgment it may have been caused by the electric flash, it will also improve or disappear when plain-

tiff's hysteria or nervous disorder disappears; that in the judgment of the specialists the nervous condition is caused through worry on the part of plaintiff, which, in all probability, will cease when his claim for compensation is adjusted. Moreover, in this connection it must be remembered that plaintiff continued his employment, with the exception of a few days, immediately after the accident until the end of February this year; that he received full pay during that period, and that, according to much of the evidence, he was able to do, and did do, the same kind of work after the accident that he did before the same occurred; that his employment was discontinued because his services were no longer required, although he could have continued in the employment with full pay for a longer time, which he voluntarily declined to do; that his vision, with correcting glasses, is 100 per cent. and that it is only when he is not using the glasses that his vision is defective; that while they do not charge the plaintiff with being a malingerer, or as wrongfully feigning injury to his eyes or loss of vision, they nevertheless insist that the defective vision is either being caused, or at least aggravated and continued, by reason of his worry and anxiety concerning his claim, and that if his claim is satisfactorily adjusted his nervous trouble will, in all probability, disappear, and that, in any event, if his claim is adjusted and settled his nerves will improve and the hysteria ultimately disappear.

The Commission was therefore confronted with a peculiar situation, and one which it had to meet in some way. If, in view of the situation, the Commission believed that plaintiff's condition was what is sometimes called a mere psychic condition, that is, mental, rather than physical, then no doubt they could take that matter into consideration in determining and fixing his compensation. The compensation statute clothes the Commission with large discretionary powers and with great latitude in proceeding to determine the ultimate questions of fact, to the end that they may reflect justice as nearly as that may be done in all kinds of cases. No doubt where, as in this case, a hysterical or nervous condition is present which was caused by the accident, such condition must be

considered in fixing the time for which compensation should be allowed where the statute itself does not fix the time and amount to be awarded. In case of temporary disability, however, the statute only fixes the maximum time    3, 4 for which compensation may be allowed, and if the Commission is convinced that less than the maximum should be allowed they must fix the time. While in fixing the compensation the Commission, as before stated, must have due regard for the claimant's nervous state, they must, however, also keep in mind the facts and circumstances of each case, and not award to the claimant compensation for a nervous condition which is not caused by the accident, which is merely mental, and which will disappear when the mind is at ease. The Commission may thus be fully justified in closing up a case and in naming a specific sum as compensation in order to end the controversy, and by that means help the applicant to adjust his mental equilibrium.

It is not our province to state, and we shall not state, just what, in view of all the circumstances, in our judgment, should have been done in this case. All we are authorized to do is to determine whether the Commission has exceeded its authority in disregarding the law or in making findings and conclusions which are not supported by some substantial legal evidence. If the Commission has not acted    5 without authority of law, and if its findings and conclusions are supported as just stated, we cannot interfere, regardless of whether we agree or do not agree with the Commission's findings and conclusions. By a mere cursory reference to plaintiff's grounds for a review it will at once be seen that the Commission did not act contrary to or in excess of its powers and jurisdiction. If the Commission had the authority to make the findings and conclusions plaintiff's counsel insist it should have made, then in view of the facts and circumstances of this case, it necessarily had the authority to make the findings and conclusions it did make. While it is true that the Commission may have committed an error of judgment in doing what it did, that, standing alone, however, gives us no authority to interfere with its findings or

conclusions.   This court may not correct the mere errors of judgment of the Commission where it acts within the bounds before stated.   Moreover, the Commission has **6** the power either to close a case or to keep it open for further consideration.   As to that, our statute, Comp. Laws Utah, 1917, § 3144, provides:

"The powers and jurisdiction of the Commission over each case shall be continuing, and it may from time to time make such modification or change with respect to former findings or orders with respect thereto as in its opinion may be justified."

Under statutes similar to ours the courts have frequently held that the Commissions have a continuing jurisdiction. See *Arcangelo* v. *Gallo et al.,* 177 App. Div. 31, 163 N. Y. Supp. 727; *Matter of Boscarino* v. *Carfagno et al.,* 220 N. Y. 323, 115 N. E. 760, Ann. Cas. 1918A, 530; *Wagon Co.* v. *Myre,* 163 Wis. 132, 157 N. W. 522.   See, also 1 Honnold, Workmen's Compensation, § 188, where the doctrine is discussed and some of the recent cases are cited.   In Honnold it is said:

"Where it appears, after a temporary total disability indemnity has been awarded, that the injuries sustained are permanent in nature, and not temporary, the findings and award will be amended, after proper notice to all parties and opportunity to be heard, to change the compensation from that based on temporary disability to that for permanent disability."

Upon the other hand, if, for any reason, the right to compensation ceases, the Commission may terminate the compensation.

While in some of the foregoing cases the courts suggest that the commission should have kept the question of fixing compensation open and should have awaited future developments, and while, under certain circumstances, that may be the better practice, yet, under statutes like ours, the jurisdiction continues whether the case is kept open or is closed.   If, therefore, it should develop that the effects of a particular accident are progressive, and that the compensation as fixed by the Commission is inadequate, the injured employé may, upon giving proper notice, apply to have the case reopened and the compensation increased where the maximum pro-

vided for by statute has not already been awarded. In this connection it should be stated that counsel for plaintiff contend that, from the examination and report of the specialist which was made at the request of the Commission, and which we have hereinbefore set forth, it is apparent that plaintiff's loss of vision is continuing and progressive. In our judgment, the specialist's report does not sustain counsel's contention. The specialist closed his report thus:

"On the whole I can't find anything showing to account for his stated loss of vision, so am forced to conclude that it is ·hysterical."

If, therefore, plaintiff's eyes have suffered no injury, and there is no physical cause except the astigmatism for his defective vision, it is not easy to perceive how it can be classed as an injury the effects of which are continuing and progressive, and cannot be determined with any degree of accuracy. While in our judgment plaintiff's case does not fall within that class, yet if it should develop that it does plaintiff has an ample remedy by following the provisions of section 3144, supra.

Nor can we agree with counsel that the Commission underestimated the amount that should have been awarded to plaintiff for permanent disability. Upon the contrary, under the decisions which are based upon statutes like ours, the Commission allowed plaintiff all, if not more than, he was entitled to for the permanent defective vision. See *Northwestern Fuel Co.* v. *Ind. Com.*, 161 Wis. 450, 152 N. W. 856, Ann. Cas. 1918A, 533, where the Wisconsin statute is set forth. See, also, *Wagon Co.* v. *Myre*, supra, and *Cline* v. *Stduebaker Corp.*, 189 Mich. 514, 519, 155 N. W. 519, 521 (L. R. A. 1916C, 1139). In the case last cited the Supreme Court of Michigan discusses how the extent of the loss of vision, which may be restored or controlled by the use of glasses, should be determined. In the course of the opinion, after discussing the facts, the court said:

"The net result is that, when using proper glasses, the claimant had 50 per cent. of his sight, while without them he has only 10 per cent. The evidence will not permit of any different conclusion.

"Under these circumstances it seems impossible to say that the injury has resulted in the loss of the eye. The use of glasses is a

very ordinary occurrence, both for the young and the old. It is unnecessary to determine whether the loss of 90 per cent. of the sight is substantially the loss of the eye, because that is not the present case. Ninety per cent. of the sight is not lost when it can be diminished to 50 per cent. by use of common appliances. And it is the duty of the sufferer to minimize the injury as much as he reasonably may."

It certainly cannot be successfully claimed that plaintiff's defective vision is greater than what he has actually lost. The evidence preponderates that with correcting glasses his vision is normal—that is, 100 per cent.—and without glasses his vision is 90 per cent. in one eye and 95 per cent. in the other eye. At most, therefore, without glasses, he has suffered a loss of vision of only 10 per cent., since his loss of vision can be no greater than that of his most defective eye, while with glasses he has suffered no loss of vision whatever. It would be nearer correct to say that his direct loss of vision is only 5 per cent., since he certainly can see to that extent with his least affected eye. While his field of vision may be somewhat reduced by merely using that eye, then that field must be equal to his least affected eye. If the result arrived at by the Commission is followed—namely, that loss of vision of 10 per cent. in one eye and a loss of vision of 5 per cent. in the other is equal to a permanent loss of vision of 15 per cent. in one eye—then it must follow that in case one suffers a loss of vision of 40 per cent. in one eye and 60 per cent. in the other his loss of vision is equal to the loss of one eye, although he might, by using glasses, greatly increase his vision. Such a conclusion is so incongruous that further comment is unnecessary. The Commission had the right, however, to take into consideration all the circumstances. It is clear, however, that when all the circumstances are considered plaintiff has still been awarded a greater amount for permanent disability than the decisions authorize. If, therefore, he has suffered some temporary disability, upon which subject the evidence is quite inconclusive, he has, nevertheless, no cause to complain. If, however, as stated, the loss of vision should prove to be continuing and progressive, the statute affords him ample remedy.

Nor is there any merit in the contention that the Commission failed to make certain specific findings. There is nothing in our statute requiring the Commission to make specific findings. While it should make findings upon all ultimate questions of fact, yet it is not required to do so. We have no doubt that, in case it were requested by either party to make specific findings, it would, however, do so.

8

In view of what has been said it follows that this proceeding should be dismissed, and the award of the Commission should be, and it accordingly is, affirmed.

CORFMAN, C. J., and WEBER, GIDEON, and THUR-MAN, JJ., concur.