## HIGLEY v. INDUSTRIAL COMMISSION et al.

No. 4722.   Decided January 24, 1930.   (285 P. 306.)

*P. C. Evans,* of Salt Lake City, for petitioner.

*George P. Parker,* Atty. Gen., for the Commission.

*Waldemar Q. Van Cott,* of Salt Lake City, for Smelting Company.

EPHRAIM HANSON, J.

Certiorari to review the action of the Industrial Commission of Utah in denying the petition of the dependents of Glen Higley, deceased, for compensation on account of his death. On May 20, 1927, Higley, an employee of the International Smelting Company, came to his death by the discharge of a 30-30 Winchester rifle. The commission found:

(1) That "the injury which resulted in the death of the deceased" was not an accidental injury but was intentionally self-inflicted; and (2) that at the time the deceased sustained the injury which resulted in his death he had departed from the course of his employment and was engaged in a venture not connected with or arising out of his employment. Both findings are assailed by the plaintiff in these proceedings.

The International Smelting Company owned and operated an aerial tramway extending from the Utah-Delaware Mining Company at Bingham over the mountains westerly to its smelter near Tooele. The aerial tramway consists of a control station at the Bingham end, a control station at the smelter end, and a control station midway between; the latter being known as control station No. 2. There are at regular and frequent intervals upright structures to carry the cables; the cables constitute circuits between the control stations, and attached to the cables are buckets which are filled with ore moving toward the smelter and empty buckets moving away from it. Control station No. 2 is located in a somewhat desolate and isolated position about $2\frac{1}{4}$ miles southeast of the smelter on the side of the mountain. Two men are constantly employed and kept at station No. 2 to control the movements of the buckets. On the day in question the head control man was Al Warr. His assistant was Charles Larson. The company maintains an apartment house for the use and benefit of the control man and his assistant at No. 2 control station. It consists of four rooms, all of which are connected by door ways. Two of the rooms are assigned to one of the men and two to the other. If the men have families, their families reside there with them. Each apartment consists of a bedroom approximately 11 feet, 4 inches by 13 feet, $2\frac{1}{2}$ inches, and a room 9 feet, $8\frac{1}{2}$ inches by 13 feet, $2\frac{1}{2}$ inches, which is generally used as a kitchen and living room. The four rooms are in a line extending practically north and south facing toward the west. The two most northerly rooms were occupied by Mr. Warr

and Mrs. Warr, and the two rooms to the south were occupied by Mr. Charles Larson, who had no family. Each apartment is furnished and equipped with such carpets, rugs, furniture, range, and cooking utensils as are adapted for ordinary housekeeping by a small family.

On the date in question there was a 30-30 Winchester rifle hanging over the door which connected the two apartments, but on the side of the apartment occupied by Mr. Larson. The rifle hung on pegs or nails 7 feet, 4 inches above the floor. The gun was the property of the company. It had been brought there by the company a number of years before during some labor troubles at Bingham. It had one or more cartridges in the magazine, but no cartridges in the chamber. The cartridges could be ejected from the magazine simply by manipulating the lever and without the cartridges going into the chamber if the operator so desired, by pulling the lever down part way; but, if the operator desired to have the gun reloaded, that could also be accomplished by pulling the lever entirely back and then forward again. This could be done without letting the hammer down.

In addition to the control men, the company employed a number of tram riders or repair men. On May 20, 1927, at about 3 o'clock p. m., Ambrose Rounds, Glen Higley, and Wilbur Murray, three repair men, on their return trip from Bingham, stopped at control station No. 2. The tram was not moving and the men had some discussion concerning powder and caps that had been left in that vicinity. Mr. Warr expressed an intention to get permission from some one at the smelter to move the powder and caps. Higley then asserted that he had already disposed of them so that they were no longer dangerous. Mr. Rounds was the acting tram foreman. The line men had intended to replace a worn cable with a new cable at anchor station No. 3, which was west of and near to control station No. 2. This work required the efforts of all three men and had to be done when the cable was not moving. Rounds and Higley preceded Mr. Murray down the steps from the top of the station structure,

Murray having delayed his departure long enough to put on his coat. Before Murray reached Mr. Rounds, Higley had already gone under the tram toward the house, which is about 25 or 30 feet from the station. When he left Rounds, Higley said: "I am going down to the house a minute, Bud." Mr. Murray did not hear the remark or see Higley go to the house. Murray joined Rounds and the two went to where the defective cable was to be removed. They waited for Higley for about 30 minutes, when the tram began to move. It was then impossible to do the required work, and Rounds rode one of the tram buskets down to the smelter. Murray waited for about 15 minutes longer and then went back to look for Higley. Not finding him at the control station, he went to the apartment house. The outer door was closed and latched. On entering the kitchen door of Larson's apartment he saw the body of Higley 2 or 3 feet inside the kitchen from the bedroom. Higley's body was slumped down resting on his toes, knees, head, and arms. His buttocks rested back upon his heels, his chin was between his knees. His left forearm was under his body and his right arm was under his chin. The rifle extended off toward the left with the butt near his left hand and close to his knees. There was a bullet wound over the left eye, showing where the bullet had entered the head of deceased. Instead of going with the other two tram riders or repair men to anchor station No. 3, Higley had proceeded to the apartment occupied by Mr. Larson on his own volition. It was unusual for the line men to go the apartments. There was nothing said about the gun in the conversation between the men while they were in the control station. Higley made no mention to any one concerning his purpose in going to the house. The record does not disclose what, if any, possible errand deceased was on in line with his employment. Mr. Rounds testified that Mrs. Higley had told him that she had requested the deceased three or four days before to bring home a medical book which belonged to the Hunsakers and which was in that apartment. The front door through which he entered the

apartment was in such a condition that the latch would not adjust itself so as to catch and hold the door closed without some special effort on the part of the person closing the door, and without this special attention the latch would not catch and the door would swing back and leave an opening of several inches. It is evident, therefore, that as he entered the apartment he closed and latched the door behind him. The gun was always directly in charge of the head control man. This was so when Rounds and the deceased, with their respective families, lived at the station. Rounds and his family lived there from March, 1924, to June, 1926. The deceased and his family lived there from August 1, 1924, to February 1, 1927. The two families were there at the same time from August 1, 1924, to June 1, 1926 (1 year and 10 months), and during that time Rounds was head control man and had charge of the gun. Rounds is a brother of Mrs. Higley, the plaintiff. When Rounds went on the line as repair man, Mr. Hunsaker was given employment at the control station and he and his family came there to live. Higley then became head control man and had direct charge of the gun. The Hunsakers had left the place and had not occupied the apartment for more than 6 weeks before the death of the deceased. When Higley left the station in February, 1927, he turned the gun and shells over to Mr. Hunsaker. The plaintiff testified that Mr. Hunsaker put some shells into the gun and hung it up above the bedroom door of the south apartment. The evidence conclusively shows that there were about three cartridges in the magazine, but none in the chamber of the gun, and that the gun was and had been most generally kept with shells in the magazine. It is also conclusively established that deceased was familiar with the mechanism of the gun and knew how to operate it. Higley was in fair health, although he entered the Bingham hospital March 25, 1927, and was there for treatment for 17 days, after which he remained at home for 8 days before going to work. His teeth were also badly infected with pyorrhea. The morning he left home on the

day of his death he kissed his wife and said, "Good-bye old dear, I will see you at 5 o'clock," and went down the walk whistling. He was a very quite man and did not talk much. There is nothing in the record to show he was in any financial difficulties or that he had any family troubles. He was 30 years of age, had a wife and three children.

The apartment in which deceased was shot had been occupied by Larson for more than 11 days prior thereto. Mrs. Warr, the wife of the head control man, was sleeping in the room next to where the rifle was hanging. The record conclusively shows that the house was maintained by the company and occupied exclusively by the control men and their families, if they had any, as a home and dwelling place. There were no toilets in the house. There is no reason appearing from the record why Mr. Higley, in the discharge of his duties as tram man or repair man, should have entered Mr. Larson's apartment.

The foreging is a fair and full statement of the facts as shown by the record upon which the Industrial Commission made the findings and conclusions now before us for review. If either one of the findings made by the Commission is supported by the evidence, it is obvious that the action of the Commission in rejecting the claim of the applicant must be affirmed.

The finding of the Commission to the effect that at the time deceased sustained the injury which resulted in his death he had departed from the course of his employment and was engaged in a venture not connected with or arising out of his employment was clearly within the jurisdiction of the Commission. This court has frequently and uniformly held that if there is "some substantial competent evidence" to support the findings and conclusions of the Commission on questions of fact within its jurisdiction, such findings are final and may not be disturbed by this court. The only purpose of review in such cases—and our authority on review in such case is so limited—is to ascertain whether the findings are supported by any such

evidence. *Bingham Mines Co.* v. *Allsop,* 59 Utah 306, 203 P. 644; *Utah Fuel Co.* v. *Industrial Comm.,* 57 Utah 246, 194 P. 122; *Moray* v. *Mountain States Tel. & Tel. Co.,* 58 Utah, 404, 199 P. 1023; *Twin Peaks Canning Co.* v. *Industrial Comm.,* 57 Utah 589, 196 P. 853, 20 A. L. R. 872. The only question, therefore, on this feature of the case is whether there is any substantial competent evidence to support such a finding.

Although we may assume for the present, and for the purpose of this particular question we do assume, that the death of the deceased was accidental, yet the burden was on the plaintiff, before the Commission, to establish by a preponderance of the evidence that the fatal gunshot wound received by the deceased arose out of or was sustained ▪ in the course of his employment. To sustain this burden it is not enough to show a state of facts which is equally consistent with no right of compensation as it is with such right. Surmise, conjecture, guess, or speculation is not sufficient to justify a finding in the plaintiff's behalf. *Bingham Mines Co.* v. *Allsop,* supra; *Von Ette's Case,* 223 Mass. 56, 111 N. E. 696, L. R. A. 1916D, 641; *Westman's Case,* 118 Me. 133, 106 A. 532; *State ex rel. Hawkins* v. *Industrial Comm.,* 157 Minn. 33, 195 N. W. 766, 36 A. L. R. 394. The deceased left his fellow workmen as they were actually in progress to where the defective cable was to be replaced by them with a new cable, and which could only be done when the cables were not in motion, all of which must have been within the knowledge of the deceased.

It is urged on behalf of the plaintiff that the deceased went to the house for the purpose of removing the shells from the gun and thereby render the place safe for the employees living in the apartments; and that by so doing he was within the course of his employment. If, for any reason, his going to the house for the purpose of removing the shells from the gun to make the apartments safe for occupants might be held to be within the course of his employment, there is no evidence in the record to show that he was

motivated by such a purpose; nor does the record disclose any fact or circumstance from which it might reasonably be inferred that the deceased had any such a purpose in going to the house. The evidence quite conclusively shows that the gun was directly and exclusively under the control of the men at the control station, and that it was of no concern to the line men as to how or where it was kept. From the first the custom and practice had been for the head control man to have the general control of the gun. On the day in question the gun was hanging in the place and in the condition it usually hung. There was certainly no emergency presenting an unusual situation with reference to the gun or anything around the house, or the premises, that called for the use of the gun which would justify the deceased to voluntarily step outside the line of his usual employment. There is no fact or circumstance shown by the evidence which, either directly or by fair inference, connects deceased's presence in the house with his duties as line man. There were no toilets in the house. The line men did not have access to the apartment except upon the invitation of those who lived there. He said nothing about the gun being dangerous to any of the men in the control station. He made no statement to any of the men as to his intention, if any he had, to go to the house for the purpose of removing the shells from the gun. If, as it is assumed by the plaintiff's brief, the deceased went to the house to remove the shells from the gun, his conduct in that regard can only be looked upon, in the light of the facts before us, as an effort to arrogate to himself duties which he was neither engaged nor authorized to perform. It is certain that he went to the house of his own volition, and if he chose to step outside the sphere of his employment and to do something he was not expected or requested to do, he did so at his own risk and was not under the protection of the compensation act.

Fair and impartial consideration of the evidence, together with the situation of the parties, the character of the employment, and the reasonable inferences which may be

drawn from the evidence, leads to the conclusion that this finding of the Commission must be sustained. It must necessarily follow that the action of the Commission in rejecting the plaintiff's petition for compensation must be affirmed. It is not necessary, therefore, for us to discuss the further question of whether the death of the deceased was accidental or intentionally self-inflicted, and upon that question we express no opinion.

The action of the Commission in rejecting plaintiff's petition for compensation is affirmed.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.