THOMPSON v. INDUSTRIAL COMMISSION et al.

No. 5399.   Decided July 11, 1933.   (23 P. [2d] 930.)

*John A. Sneddon,* of Ogden, for plaintiff.

*Joseph Chez,* Atty. Gen., *Grover A. Giles,* Deputy Atty. Gen., and *E. F. Richards,* of Salt Lake City, for defendants.

FOLLAND, J.

This is an original proceeding to review a decision of The Industrial Commission of Utah denying compensation. William F. Thompson, the plaintiff, was for about four years employed at the Hylton Flour Mills at Ogden as oiler and sweeper. His duties required him to oil and fumigate the machinery, clean and dust collectors, and sweep the floors of the mill. He alleges that on July 10, 1932, while shaking a dust collector, particles of dust entered his eye, caused an ulcer of the right eye to become perforated, resulting in almost total disability of that eye. After a hearing, the commission made findings of fact against applicant and denied compensation. The points relied on for reversal are: (a) That the findings of the commission are not findings of fact but are conclusions of law; (b) that the commission did not make findings on all the material issues; and (c) that the findings of fact, if held to be sufficient as findings, are not supported by the evidence.

By the first finding the commission merely recited the allegations or claim made by applicant. The second finding is as follows: "The applicant has failed to sustain by competent evidence his burden of proof to show that the condition complained of was, either directly or indirectly, due to an accident arising out of or in the

course of his employment while employed by the Hylton Flour Mills at Ogden, Utah."

The ultimate fact to be found was whether or not the applicant sustained an injury by accident arising out of or in the course of employment. No direct finding was made on that determinative issue. The finding is that the applicant failed to sustain the burden of proof. The burden of proving that he sustained an injury by accident in employment rested on the applicant. If he failed to do so, the finding should have been against him. The finding as made is equivalent to a finding that the applicant did not sustain an injury by accident arising out of or in the course of his employment. If the commission had used such language, it would be a finding of the ultimate fact in issue. In view of the conclusion we have reached on the facts, we are disposed to treat the finding as one to the effect that applicant did not sustain an injury by accident in the course of or arising out of his employment. *Banks* v. *Industrial Commission*, 74 Utah 166, 278 P. 58; *Robinson* v. *Thomas*, 75 Utah 446, 286 P. 625.

Plaintiff cites and relies on the case of *West* v. *Standard Fuel Company* (Utah), 17 P. (2d) 291, 292, as holding it is the duty of the trial court to make findings on all the material issues raised by the pleadings, and that it is prejudicial error for it to fail to find on issues raised by the pleadings and the evidence. That is undoubtedly the general rule applicable to the making of findings of fact by a court, but the rule is not applicable in proceedings before the Industrial Commission. The statute does not require the making of findings of fact by the commission, and this court has held that findings of fact are not legally essential to a valid award, but has suggested that it is advisable to make findings of ultimate facts in each case. *Geo. A. Lowe Co.* v. *Industrial Commission*, 56 Utah 519, 190 P. 934; *Bingham Mines Co.* v. *Allsop*, 59 Utah 306, 203 P. 644. Ordinarily the making of specific findings on all issues presented is better practice, is fairer to the parties,

and more helpful to the court. The ultimate fact having been found by the commission, it is sufficient, and, if supported by the evidence, will dispose of the case.

The precise point made on the merits is whether or not plaintiff's eye condition was caused by accident. Plaintiff contends that some dust or other foreign substance fell into his eye on July 10th, which caused an ulcer to break, resulting in the almost total loss of eyesight to his right eye. Defendants contend the condition of the right eye and the left one was an occupational disease, incurred gradually in the course of his work in the mill, and that there was no specific event or occurrence which can be referred to as the starting point of the condition or injury.

The undisputed facts are that plaintiff worked for about four years in the Hylton Flour Mills as oiler and sweeper, and that his eyes were in sufficiently good condition that he could read with the aid of glasses and take care of his duties in the mill, that at the beginning of his service he used glasses, was nearsighted, and that his eyes gradually became worse, so that at the time he ceased employment his right eye had reached the last stage of disability, and he could not read with the left eye "any more." He worked continuously up to the 11th day of July, laid off on the 12th and 13th, and worked again on the 14th, and on the 15th he did not go to work. His wife notified the office he was too sick to go to work. He did not consult a physician until after the 14th of July and after an ulcer in the right eye broke. He made no complaint to the management of any accident or injury to his eye until after he quit work on the 14th. There was disagreement in the testimony as to what was told the officials of the company when he did not return to work on the 15th. Mrs. Thompson testified she notified the office he could not return to work because "my husband was sick, that his eyes were hurting so bad he could not come to work that day, and would come as soon as he could." The representatives of the mill testified they were informed merely that he had a cold.

Thompson testified as follows on examination by his counsel:

"Q. Did you sustain an injury while you were at work? A. Through this dust fumigating that irritated my eyes in a way so they were inflamed so they caused this ulcer as they call it that came on there.

"Q. Now when did you sustain the injury there? Just go ahead and tell us the history of your case. A. It began about two or three months previous to this time of the accident, it made it hurt a little more than usual, the pain and itching and irritating to my eyes.

"Q. When did it result so that you could not proceed to work any more? A. About the 10th, it commenced to hurt me and the 14th was the last that I could work. * * *

"Q. Did you tell any of them about the condition of your eyes? A. While I was off?

"Q. While you were at work? A. They knew that my eyes was failing like.

"Q. Who knew that? A. Mr. Taylor I presume.

"Q. Whom? A. Mr. Taylor.

"Q. Did you have any talk with him about it, with Mr. Taylor? A. Not about any accident.

"Q. Did you yourself give him any reason why you were unable to continue with the work? A. No, sir.

"Q. Did you have anyone waiting upon you or doctoring your eyes? A. Only home treatments.

"Q. What kind of treatment did you give it? A. Just this McKesson eye water.

"Q. How long had you been using that prior to July the 14th? A. Several months.

"Q. Your eyes were failing you for several months before July the 14th?. A. Yes."

On examination by Commissioner Knerr he testified:

"Q. Now did anything happen to you on July the 10th? A. That is when it began to—when I began to feel the effects of the itching.

"Q. Just what happened to make you feel that if you know? A. Felt like something got in my eye and irritated it.

"Q. Do you know whether or not anything did in fact get into your eyes at that time? A. I think it did.

"Q. What made you think that? A. Because when I was cleaning the dust collectors out there was dust dropping down from these machines into my face.

"Q. What did you do when that happened? A. It watered, and I worked with them and I went down to the lavatory and bathed them in cold water.

"Q. Now prior to July the 10th, were you able to read? A. Yes.

"Q. And from July the 10th, just what was the condition from the time that you say you were shaking this dust collector from that time on up to July the 18th when you saw the doctor, what was the condition of your eyes from day to day? A. Felt kind of an irritation in them.

"Q. Do you know whether or not you got any foreign body out of your eye on July the 10th? A. It relieved it to a certain extent when I bathed my eyes.

"Q. You say your eyes troubled you for perhaps four months prior to this? A. Yes.

"Q. When you stated that what do you mean? A. The dust while cleaning it seems to irritate my eyes so it would make them inflamed.

"Q. Did anything different happen on July the 10th than previous to make your eyes irritated? A. When this dust got in my eyes at the time in cleaning these dust collectors.

"Q. Was that the first time? A. That is when it began to get worse, the effects of the irritation.

"Q. What that the first time you got the dust in your eyes by shaking the dust collectors? A. Not the first, but it was through constant cleaning of these machines, brushing them and cleaning them.

"Q. Do you think it was through constant cleaning of the machines, or do you think it was by reason of this one particular act? A. I think the particular time that caused the real sudden starting of this seriousness in my eyes."

On examination by counsel for defendant insurance carrier he said:

"Q. You had got stuff in your eyes previous to this time? A. When we cleaned—when we were brushing down more or less dust would get into my eyes.

"Q. Been doing that for four years? A. Yes. I was cleaning there for about four years. * * *

"Q. Was there any more got in on July the 10th than when you cleaned them previous times? A. It is the same every time I would clean the dust collectors.

"Q. Every time you cleaned the dust collectors out? A. I would get some stuff in there—and I would have to go down and wash my eyes out.

"Q. You didn't do anything different on July the 10th than you had previously when you cleaned out the dust collectors? A. On July the 10th, that is when they had this dust collector cleaned out.

"Q. You didn't hear my question. You had cleaned dust collectors many times before? A. Every Sunday.

"Q. Each time you would get some dust in your eyes? A. Yes.

"Q. You would go down and bathe them? A. Yes.

"Q. Only July the 10th you got some dust in your eyes? A. Yes.

"Q. And you went down and bathed them? A. Yes.

"Q. Just the same as you did many times before when you got dust in your eyes? A. Not every day. Just Sundays."

Dr. Hetzel, the physician who treated the applicant on and after July 18th, testified:

"A. When he came in to me he had a perforated ulcer in the cornea.

"Q. Which eye? A. I don't remember—the right eye. A shrinking of the eyeball, and deformity there; adhesions of the iris. That was due I would say to the ulcer forming in the eye, causing it to break through. What got in there I don't know. He said he was cleaning dust, so I imagine it was that.

"Q. You heard him testify today? Give us your opinion whether or not this is what we call an occupational disease or something happening to bring about the condition? A. There is no question but what he had an inflammation of the lids, and the eyeball besides to some extent, but I think something got in there to stir up this trouble.

"Q. At one time? A. At a recent time, to stir this up. I don't know what the condition was before this but I know what it was after.

"Q. How did you diagnose his eyes, as to the cause of his present condition? A. It is an ulcer. Most ulcers are due to foreign bodies getting in there for a length of time. It is particularly true in the milling business. In the milling business they are exposed to the dust of the mill and the wheat dust and it is starchy, and has a sharp edge to it that scratches. He may have had enough inflammation in the eye in the first place and all that it needed was to cut a hole in the cornea where the inflammation could go in.

"Q. Assuming that the applicant testified to the truth, do you think that on July the 10th that incident would be the aggravating cause? A. Anything that got into the eye would stir it up. If you got flour dust in there it could very easily cause infection.

"Q. Is his case such that it can be cured by proper medical treatment? A. So he can get normal vision?

"Q. Yes. A. No.

"Q. Can it be improved? A. Yes.

"Q. Considerably? A. Yes, by the proper treatment and glasses.

"Q. How about the use of glasses? A. His age would preclude normal vision."

Dr. Pugmire, called by defendant, testified:

"A. In the right eye he had thickened lids and an inflamed cornea with pannus coming on.

"Q. That is the right eye? A. Pannus coming down over the top to the edge of the pupil with a scar over the pupil, and the iris had been bound down to the lens of the eye, that is the right eye. The left eye has thickened lids some with a pannus coming down to the edge of the pupil over the cornea, and the pupils seem to be adherent to the lens. I didn't dilate it to see, but it looked like it was adherent to the lens. The vision in the right eye was barely light perception. In the left eye he could count fingers very poorly at three feet. * * * He gave a history that he had had eye trouble for four years, and I believe he was telling the truth when he said he had had it that long.

"Q. Did he state anything happened on July the 10th? A. He said on July 10th he felt some scratching of his eye, and on July the 14th he quit work, and on the 17th his eye bursted, and on the 18th he went to see the doctor. * * *

"Q. Doctor, in his right eye you saw evidence there of a bursting of the pupil? A. Yes, it looked like an old corneal ulcer. I could not say it bursted, be he had an old scar there that was probably from a corneal ulcer.

"Q. Was there indication it had bursted? A. It had passed away.

"Q. The right eye is practically nil, that is the eyesight? A. Yes, sir. * * · *

"Q. So it is possible that the scratching sensation felt was the bulging of the ulcer when it started to form? A. He had a breaking down of his cornea. Every time his lid would go over it it would feel like he had something there.

"Q. That comes on gradually? A. Usually.

"Q. In a few days it becomes so that it is noticeable? A. Yes.

"Q. In your opinion could that happen to this man's eye? A. Yes.

"Q. If he had given you no history of getting something in his eye you would not be able to determine it was dust, or a pannus, or a trichomatous condition? A. No.

"Q. It could happen both ways? A. Yes."

It is the uniform holding of this court that, if there is sufficient substantial competent evidence to support the findings and conclusions of the commission on questions of fact within its jurisdiction, such findings and conclusions are final and may not be disturbed by the court. *Higley* v. *Industrial Commission,* 75 Utah 361, 285 P. 306.

In *Tintic Milling Co.* v. *Industrial Commission,* 60 Utah 14, 206 P. 278, 280, 23 A. L. R. 325, the court discussed the distinction between accident and occupational disease, as follows:

"The citation from Honnold, supra, contains the following definition:

" 'The word "accident" refers to the cause of the injury, and it is here used in its ordinary and popular sense, as denoting an unlooked for mishap, or an untoward event, which is not expected or designed by the workman himself, as a physiological injury as a result of the work he is engaged in, an unusual effect of a known cause, a casualty. It implies that there was an external act or occurrence which caused the injury or death. It contemplates an event not within one's foresight and expectation resulting in a mishap causing injury to the employee.' [1 Honnold, Workmen's Compensation, 274]  *  *  *  Where there is any attempt to define the meaning of the word 'accident,' as used in compensation acts, the cases cited by plaintiffs are generally in accord with the definition given by Honnold. What is termed an accident must be something out of the ordinary, unexpected, and definitely located as to time and place. If the injury is incurred gradually in the course of the employment, and because thereof, and there is no specific event or occurrence known as the starting point, it is held to be an occupational disease, and not an injury resulting from accident. Such, in the opinion of the writer, is the rule, well sustained by both reason and authority, and is not seriously controverted by any well-considered case cited by either of the parties in the instant case."

An occupational disease has been defined as "a diseased condition arising gradually from the character of the employee's work, but it is not an 'accident,' " and an accident "is distinguished from an occupational disease, in that it arises by some definite event, the date of which can be fixed with certainty, but which cannot be so fixed in the case of occupational disease." *Wilson & Co.* v. *McGee* (Okl. Sup.) 21 P. (2d) 25, 27.

The Industrial Commission concluded that no accident was proved which caused the condition to plaintiff's eye of which he complains. From the evidence we cannot well say an accidental injury occurred on the 10th of July causing an existing ulcer to break. The ulcer did not break on that day but several days later. Plaintiff

worked all that day and the 11th and 14th following, during which time he suffered irritation in his eye as he had previously. According to his own statement, the condition was of long standing and gradually became worse.

We are satisfied the evidence is not of sufficient weight and force to command a finding of an accidental injury. On the other hand, the preponderance of evidence does support the finding that an accident did not cause the injury complained of. Whether there is sufficient competent evidence to support a finding, if it had been made, that a foreign substance got into the eye on the 10th of July is a question not before us and which we need not decide. It is sufficient to say there is sufficient competent evidence to support the finding and conclusion of the commission that the condition was not caused by an accident.

The decision of the Industrial Commission of Utah is affirmed.

STRAUP, C. J., and ELIAS HANSEN, EPHRAIM HANSON, and MOFFATT, JJ., concur.