## McGREW et al. v. INDUSTRIAL COMMISSION.

No. 5981. Decided December 14, 1938. (85 P. 2d 608.)

*Shirley P. Jones* and *Bagley, Judd, Ray & Nebeker,* all of Salt Lake City, for plaintiffs.

*Joseph Chez,* Atty. Gen., and *S. D. Huffaker,* Deputy Atty. Gen., for defendants.

LARSON, Justice.

By this action the plaintiffs seek to have the Utah Minimum Wage Law declared void. They bring this action to en-

join the Industrial Commission from enforcing its order fixing a minimum wage and maximum hours for women and minors engaged in the retail trades. The Utah Minimum Wage Law was enacted by the legislative session of 1933 (Chapter 38, Laws of Utah 1933), but for want of funds no effort was made to put it into operation until 1937. After some investigations and informal hearings the Commission made and entered its "Mandatory Order Number One," covering women and minors in the Retail Trade Occupation. The order provided inter alia that seven (7) hours constitute a standard day; and forty-two and one-half (42½) hours, one standard week, thus allowing for one maximum day per week of seven and one half (7½) hours; a minimum weekly wage of $16 per week was fixed for women and minors, effective as to boys only under 18 years of age. Various other provisions, mostly regulatory, were provided in the order but they will be referred to only as necessary in the course of the opinion. Plaintiffs, consisting of more than 120 small retail merchants, ask us to void and enjoin enforcement of "Mandatory Order Number One," on the grounds:

(a) That the Minimum Wage Law is in violation of the provisions of the Constitution of the State of Utah, in that it deprives them of property without due process of law, and interferes unreasonably with the freedom of contract;

(b) That the procedure leading up to and resulting in the issuance of Mandatory Order Number One, was insufficient, and the order therefore void.

We note them in order.

Does the minimum wage law deprive plaintiffs of property without due process of law? Does it deprive them of property at all? We are certain it does not. The word "property" although in common parlance applied to a tract of land or a chattle, to a physical thing, means in its legal signification only the *rights* of the owner in relation to it. Property is the right of any person to possess, use, enjoy and dispose of a thing. The term "property" is often used

to indicate the *res*, or subject of the property rather than the property itself. *Rigney* v. *Chicago*, 102 Ill. 64, 77. "The words *'life,' 'liberty,' and 'property'* are constitutional terms, and are to be taken in their broadest sense. They indicate the three great subdivisions of all civil right. The term 'property,' in this clause, embraces all valuable interests which a man may possess *outside of himself;* that is to say, outside of his life and liberty. It is not confined to mere tangible property but extends to every species of vested right." *Campbell* v. *Holt*, 115 U. S. 620, 6 S. Ct. 209, 214, 29 L. Ed. 483; *Board of Education* v. *Blodgett*, 155 Ill. 441, 40 N. E. 1025, 31 L. R. A. 70, 46 Am. St. Rep. 348. Material objects therefore are often spoken of as property because they are impressed by the laws and usages of society with certain qualities, among which are fundamentally the right of the occupant to *use* and *enjoy* them exclusively, and his absolute power to *sell* and *dispose of them;* and as property consists in the impression of these qualities upon material things, whatever removes the qualities interferes with property though the material things are not disturbed or touched. Thus one may be said to have a special property in his profession or calling by means of which he makes his support, and he can be deprived of it only by due process of law. *Blair* v. *Ridgely*, 41 Mo. 63, 173, 97 Am. Dec. 248. We refer to this because it is necessary to keep this broad and true meaning of property in mind when considering the constitutional questions here presented. The right to work, the right to engage in gainful occupations, the right to receive compensation for one's work are essentially property rights. So too is the right to enjoy the benefits resulting from the work of one so employed. So also the right to engage in commerce or in legitimate business is property. But no man can have a vested interest in the work or labor of another. He has no right in law to insist that another must work for him. Such right would amount to involuntary servitude or slavery and be in violation of Section 21 of Article 1 of the State Constitution. Labor is not a mere commodity to be

bought and sold upon the market but is part of the warp and woof of the life of the laborer. The employer is entitled to have, to own, and use the result of the effort, energy and toil of his employee. That right is his property. But the activity exerted, the energy used, the strength expended and the skill applied belong to the workman. They are part of his body, part of his life and can neither be bought nor sold. One's body and life are his own and he cannot be required to yield up either except at his own desire, the call of his country, or the decree of his God. In and to those things no one else can acquire any rights whatsoever. An employer therefore can have no vested right in the work or labor of any other person or group or class of persons. His right as an employer is merely the right to receive the usufruct or benefits or results of the efforts of such persons as he may induce to work at his establishment or place of business within the limitations laid down by the law. Under the minimum wage law he is not required to employ any one; he is not forbidden to employ any one; he is not required to pay any set wage or to have people work any set number of hours. He is merely forbidden to work any woman or minor under eighteen years of age more than seven hours per day or 42 and ½ hours per week or to pay them at less than $16 per week. It is clear that no property right is taken from the employer.

How stands it as to the employee? In the first place no employee is complaining and it is elemental that one cannot question the validity of a legislative act until or unless he is affected thereby. For a plaintiff to have standing in court his rights must be affected or threatened. However it is evident that the law does not take from a workman ■ the right to seek employment, to work, to receive compensation therefor or to expend his energy, effort, time or toil, in any legitimate enterprise for himself or for any other person. It merely requires the employer to pay the workman at least a living wage and to only work him a reasonable time each day to earn such wage. This Act therefore is not subject to the objection that it takes property

either with or without due process of law, Const. art. 1, § 7. No property right is involved.

It is next asserted that even if the Act does not affect rights under a contract it limits and deprives persons of the right to make a contract and is therefore void. The right to make or enter into a contract is not an economic right; it is not property. It is a right that is non-salable, non-assignable, non-transferable and non-alienable. It inheres in the individual and can be exercised only by him. The rights accruing under a made contract are property but the right to make a contract is not property. It is a matter of civil or political liberty and comes under the *liberty* provision of the *due process clause* of the constitution and under the *property* provision. This is recognized by the hackneyed expression, "liberty of contract." *Dennis* v. *Moses*, 18 Wash. 537, 52 P. 333, 40 L. R. A. 302.

Does the Minimum Wage Law unlawfully interfere with this "freedom or liberty of contract"? "Contract" is not mentioned in the section we have under consideration. It comes into the matter from giving to the word "liberty" the meaning of the "right to do what one wants to do." In such meaning practically all laws are interferences with liberty. But liberty as used in the constitution is the right to enjoy to the fullest extent the privileges and immunities given or assured by law to people living within the country and under a government which "derives its just powers from the consent of the governed," subject only to such restrictions as may be imposed by law for the benefit of the whole, within the limits of a written constitution and to a like liberty on the part of the other members of body public. That the State may impose limitations and regulations on the right to contract has never been questioned but the question as to how far the State may go has been raised often. Many laws restricting this right have been upheld. The one most commonly called to mind is the Usury Law which prohibits contracts by which a man may receive more than a specified rate of interest for the money he lends.

Many Sunday laws prohibit all contracts made on Sunday, one seventh of our natural life. Insurance rates and policy terms are regulated. Telephone charges, railroad rates, power, light, and gas rates are not only controlled and limited but prescribed and fixed by law. *Utah Copper Company* v. *Public Utilities Commission*, 59 Utah 191, 203 P. 627; *Salt Lake City* v. *Utah Light & Traction Company*, 52 Utah 210, 173 P. 556, 3 A. L. R. 715; *Union Portland Cement Co.* v. *Public Utilities Commission*, 56 Utah 175, 189 P. 593; *United States Smelting, Refining Company* v. *Utah Power & Light Company*, 58 Utah 168, 197 P. 902; *German Alliance Insurance Company* v. *Lewis*, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; *National Union Fire Insurance Co.* v. *Wanberg*, 260 U. S. 71, 43 S. Ct. 32, 67 L. Ed. 136. Laws prohibiting the sale of tobacco or alcoholic liquors to certain classes of persons, or at all, have been upheld as well as laws forbidding payment of sailors' wages in advance. *Patterson* v. *Bark Eudora*, 190 U. S. 169, 23 S. Ct. 821, 47 L. Ed. 1002. Employers of miners may be required to pay for coal mined before screening, *McLean* v. *Arkansas*, 211 U. S. 539, 29 S. Ct. 206, 53 L. Ed. 315; laws requiring store orders issued for wages to be redeemable in cash, *Knoxville Iron Co.* v. *Harbison*, 183 U. S. 13, 22 S. Ct. 1, 46 L. Ed. 55; laws prohibiting the sale of certain produce or of produce from certain regions, and so on ad infinitum.

The right to regulate hours of labor in certain industries and as to women in industry has universally been upheld as well as the right to require payment of time and one half for overtime hours of work. *Muller* v. *Oregon*, 208 U. S. 412, 28 S. Ct. 324, 52 L. Ed. 551, 13 Ann. Cas. 957; *Riley* v. *Massachusetts*, 232 U. S. 671, 34 S. Ct. 469, 58 L. Ed. 788; *Hawley* v. *Walker*, 232 U. S. 718, 34 S. Ct. 479, 58 L. Ed. 813; *Miller* v. *Wilson*, 236 U. S. 373, 35 S. Ct. 342, 343, 59 L. Ed. 628, L. R. A. 1915F, 829; *Bosley* v. *McLaughlin*, 236 U. S. 385, 35 S. Ct. 345, 59 L. Ed. 632; *Bunting* v. *Oregon*, 243 U. S. 426, 37 S. Ct. 435, 61 L. Ed. 830, Ann. Cas. 1918A, 1043.

All such regulatory acts are upheld on the principle that they fall within the police power of the state. The existence of this power and its sources and purposes are much more easily perceived than are its boundaries or limits. Said Chief Justice Shaw in *Commonwealth* v. *Alger,* 7 Cush., Mass., 53, it is

"the power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same."

Chief Justice Redfield, in *Thorpe* v. *Rutland & Burlington R. R. Co.,* 27 Vt. 140, 62 Am. Dec. 625, put it in this language:

"This police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state. * * * It must of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others."

This power is generally conceded to include everything essential to the public safety, health and morals, and it has been held without dissent that this power is virile enough to put in State control the rights and properties which depend for their existence and enforcement upon contracts, and to subject them to such general regulations as may be for the good government of the State and the protection of such rights of individuals as may be deemed important.

The attack on minimum wage laws has generally been that they deprive persons of property or liberty of contract. But as shown all rights of property and all rights of contract are subject to regulation to insure the safety, health and morals of the State and its inhabitants. Much has been said as to the justification of minimum wage laws in protecting the health of women and minors. Our act also requires the Industrial Commission to take into consideration the elements of morals, and it is argued

that there is no relationship between income and morals and that the better paid women are often as immoral as the under paid ones. The state on the other hand contends that economic conditions often influence, encourage, induce or compel women who cannot earn a decent living with their hands to earn it with their bodies. Both of these arguments are largely beside the question. The problem of public morals has but little to do with sexual proclivities. The latter are usually dealt with by the criminal laws as safety and health measures. The morality with which the State is here concerned is the morality of the body politic, the morality of the mass of its citizenry; the moral attitude of the inhabitants towards the government and the purposes and ideals for which the State was established and which it aims to secure. Can anyone gainsay that a virile, enthusiastic and patriotic citizenry is for the general welfare of the state? Can it be doubted that the production of such a condition is a proper undertaking for the state? And is not the primary purpose of our government to insure its citizens not only life and political liberty but the pursuit of happiness, for "man is that he might have joy"? Any condition which causes great numbers of our citizens to be, or to feel that they are being exploited for the benefit of others; any condition that causes great numbers of the people to feel that the state is not interested in protecting them, that causes them to doubt that the government is established for the benefit of all, is one that invites public attention and remedy. Too long working hours, or too small wages tend to undermine the spirits, hope and the courage of the persons affected. They breed discontent, despondency and disrespect for law, order and government. Lack of decent living, hunger and want of moderate relaxation and pleasure leads to pilfering, shoplifting and embezzling, sex immorality, and other crimes. At least it gives stimulus to such temptations and encourages such conduct by salving the conscience with the bromide, "I am earning more than I get." The constant denial of self so one is always hungry or must feel ashamed

of one's inadequate, meagre or patched wardrobe when one is working day after day for others who seem to have plenty of both food and clothing, undermines the character, the ideals, the morale of people, until they lose the spirit of pride in their status, in their citizenship and in their country, which they may come to feel has displayed no interest in their welfare. The preservation of the state, the very existence of the government, the orderly procedure of the body politic, all require that the great body of the citizenry shall be happy, moderately contented and proud of their country and their citizenship. The better the morale the higher the moral attitude of the people towards the government, the more successfully can the government operate. Democracy can exist and maintain itself only as long as the people feel that it subserves its purpose of equality of opportunity and freedom from political, economic or intellectual slavery or involuntary servitude. It must protect alike the weak against the strong and the strong against the weak; it must protect the rich against the poor and the poor against the rich; and must see that labor and capital alike receive their just deserts; that when men are engaged in a common legitimate enterprise, that is, when several contribute to a beneficial result, that one by the advantage of position shall not exploit the others. To do less than this is not democracy. And no constitution establishing a government of the people, for the people and by the people can lend itself to a construction that denies such rights or such duties. The State Constitution in its preamble declares it is established "in order to secure and perpetuate the principles of free government," and Section 2 of Article 1 declares that a free government is founded on the authority of the people "for their equal protection and benefit." Any law that denies to one the equal protection and benefit it insures to another contravenes the spirit of the Constitution. Likewise it must follow that any law, positive in its nature, that is passed to insure to one citizen a protection, a benefit or an opportunity or choice more nearly equal to that which the law gives to another is

within the letter and spirit of the Constitution. And so while the law gives to man the right to enter into contracts for legitimate purposes it also decrees that when such contracts are made, the parties should be on an equality, that is, that each should be equally free to contract and that one should not be acting under the compulsion or coercion of any person or thing whatsoever. And in a situation such as we have where men are under legal as well as moral responsibility to provide for their families, and women too are under legal responsibility to provide for their offspring; where workers are abundant and work scarce, where there are scores of persons seeking each job or place of employment, many so desperately in need that they are prone to take work at any price, the employers, relatively few in number, are placed in a position of great tactical and strategic advantage, and such few as may be unscrupulous, taking advantage of the dire necessities of the workers, may impose unconscionable terms of wages and hours on the workers. Can anyone question the right of State to require that Esau be fed before Jacob drives a bargain with him for the sale of his birthright? Courts have often held that where economic or social developments have created conditions under which the employer and employe were not on a parity in making contracts of employment, or where both were not relatively free in making or rejecting such contracts, the state may prescribe regulations in the form of maximum hours and minimum wages, that is, the law may seek to equalize in some measure the inequalities between the parties in contracting which economic or social conditions have created. *Vernon* v. *Bethel,* 2 Eden's Ch. Rep. 68; *State* v. *Holden,* 14 Utah 71, 46 P. 756, 37 L. R. A. 103; *Holden* v. *Hardy,* 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed. 780; *Parrish* v. *West Coast Hotel Co.,* 185 Wash. 581, 55 P. 2d 1083; *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 57 S. Ct. 578, 81 L. Ed. 703, 108 A. L. R. 1330; *Larsen* v. *Rice,* 100 Wash. 642, 171 P. 1037. Liberty of contract does not mean the right to make any kind of contract with any body but merely the right to make contracts with

competent persons on a plane of relative parity or freedom of choice, and within the limits allowed or not forbidden by law. We add two further thoughts. Within the realm of police power the legislature may act in any matter not forbidden by the Constitution expressly or by necessary implication. We find no restrictions in the Constitution on the right of the state to prescribe maximum hours, minimum wages or general conditions of labor in the state. Also Article 16 of the Constitution provides (Section 1) that "The rights of labor shall have just protection through laws calculated to promote the industrial welfare of the State." What laws are to be enacted calculated to promote the industrial welfare of the state is for the determination of the legislature, and in general its determination as to what laws are so calculated is final and conclusive. It may well decide that a minimum wage and maximum hour law for women and minors is calculated to promote the industrial welfare of the state. And whatever laws it may enact to promote the industrial welfare of the state must be so framed as to give the rights of labor just protection. As to the efficacy or wisdom of such laws we have nothing to do. That argument should be addressed to the legislature.

By supplemental briefs filed since the argument counsel has discussed the effect of House Joint Resolution Number 10 proposing an amendment to Article 16 of the Constitution of the State (section 8, see Laws 1933, p. 161), authorizing the legislature to provide for the establishment of a minimum wage for women and minors. This resolution was passed by the legislature March 9, 1933, the same day as the minimum wage law, Chapter 38, Laws of Utah 1933, was passed by the Legislature. The proposed amendment was submitted to the electors of the State on Tuesday, November 8, 1933, and ratified by a majority vote of the electors. The plaintiffs assail it as not properly ratified and adopted while the State relies upon it as retroactive to further uphold its cause. We need not pass upon the question because the amendment if validly adopted and

ratified would not be retroactive. The minimum wage law, if valid, must have been within the legislative power to enact when it was adopted in March, 1933, that is under the Constitution without the amendment. We hold that under the Constitution the legislature in 1933 had the power to enact legislation to provide maximum hours, minimum wages and regulate general conditions of labor at least as to women and minors in any or all industry in the State. The record discloses that generally the employers affected by the Order in the instant case have manifested a fair spirit in a desire to cooperate with their employees, but as is the case with all prohibitory or regulatory laws they affect the many to protect the public from the acts of the few.

This brings us to a consideration of point (b)—that Mandatory Order Number One is void even though the legislature has constitutional authority to enact laws prescribing minimum wages and maximum hours in industry. Plaintiffs charge that Mandatory Order Number One is void because: 1. Chapter 38 constitutes a delegation of legislative authority to the Industrial Commission; 2. Under it the Commission invades industrial fields entirely unrelated to wages and hours; 3. The Wage Board was not properly appointed; 4. No distinctions are recognized between minors and adults or between women and boys under eighteen years of age; 5. The procedure followed by the Commission does not constitute "due process of law"; 6. No public hearing, as required by the Act, was held by the Commission; 7. There was no competent evidence upon which to base the Order and no findings of fact were made by the Commission. We shall dispose of each of these objections in order.

1. The Act provides in Sections 4 and 5:

"If, after investigation, the commission is of the opinion, that, in any occupation, trade, or industry, the wages paid to women and minors are inadequate to supply the cost of proper living, or the hours or conditions of labor are prejudicial to the health, morals or welfare of the workers, the commission shall call a conference," etc.

Section 4. An inquiry shall be had and if conditions warrant a public hearing shall be held to determine if there is any need for the making of an order by the Commission fixing minimum wages or maximum hours of labor. It is urged that thereby the legislature delegated to the Industrial Commission the right to determine whether or not a minimum wage law should be in effect in Utah and the terms thereof. The position is not tenable. The legislature definitely enacted and established a minimum wage law for women and minors under 18 years of age in industry. The Act contemplates that females and boys under eighteen years of age, employed in industry, shall receive not less than the minimum wage and shall work not more than the maximum number of hours provided by the Act. Any one paying less than the minimum wage provided or working employees more than the maximum hours shall be guilty of a misdemeanor. True, no amount is given in figures as the minimum wage nor a prescribed number of hours as the maximum. The Act provides that the minimum wage which can be paid is "a wage adequate to supply to such women and minors the necessary cost of proper living and to maintain the health and welfare" (Section 5), and maximum hours as not exceeding the number of hours consistent with their health and welfare. Such wages or hours may vary with the different industries or with different localities. And as long as the employer does not transgress these rules he may make any contract of employment he can with his employees. True the definitions or terms are general but so are laws requiring employers to provide employees with places reasonably safe to work; laws requiring speed on the highways to be reasonable and safe considering the conditions of traffic; rules with respect to the exercise of reasonable care; that buildings must be properly or sufficiently lighted; and that foodstuffs must be suitable for human consumption. All these have been upheld by the court time and again. As long as the employer pays such a wage and does not exceed the requirements as to hours he goes along unhampered by the Commission. As long as

he observes the law he is unaffected by any action or orders of the Commission. But when the Commission, which is charged with the duty of keeping itself informed as to wages paid, hours and conditions of labor in industry, shall be of the opinion that the employers of women and minors in any industry shall be paying inadequate wages or maintaining unduly long hours, it shall institute an investigation under Section 4 of the Act. That such investigation shall be thorough, complete and fair, and receive more time than the commissioners with their multiple other duties could give, the Commission appoints an investigating committee known as a wage board, which shall investigate the matter of wages, hours, and conditions of labor in the particular industry; also the costs of living for such employees, the number of hours they can safely and healthfully work in that industry and the conditions which should surround such workers at the place of work to reasonably protect their health and general welfare. That this committee called the Wage Board may function properly and efficiently and have some familiarity with the problems with which it deals it is provided that it must consist of a number of employees in the industry under investigation and an equal number of employers in the same industry, with a member of the Commission as chairman. This board is merely an investigating agent for the Commission to ascertain the facts and make a preliminary determination as to whether or not the spirit of the law is being violated. The Wage Board does not fix minimum wages, maximum hours or conditions of labor. It investigates, finds facts and makes recommendations to the Commission much as a referee does to a court. The board shall keep a record of its proceedings, its deliberations, and all evidence, documentary or parole, it receives, for the use of the Commission. If the board finds that the wages paid in the industry are not below the minimum, that is, are adequate, the hours of labor are not too long and labor conditions are satisfactory, it may so report to the Commission and presumably nothing further will be done. But

if the board finds that wages are too low, hours too long, or labor conditions harmful, it makes findings of what these things should be and files the same together with the record of its proceedings, deliberations and evidence with the Commission. (Section 4.)

Should the Commission after examination of the report decide that the same warrants any action it shall upon its own motion, or upon petition, fix a time for public hearings on the matter, notice of which shall be given as provided in subsection (b) of Section 5 of the Act. This hearing is not a mass meeting at which people may appear to discuss the virtues of minimum wages laws, or the reasons for their enactment, or the public sentiment with relation thereto. It is a quasi-judicial hearing conducted by the Commission and confined to an investigation into the questions: (a) Are the wages being paid in the particular industry adequate to supply the costs of proper living? (b) If not, what is a proper wage? (c) Are the hours or conditions of labor in the industry such as to be prejudicial to the health, morals, or welfare of the workers? (d) If so, what is the proper remedy or correction to be applied? *Fred O. Morgan* v. *United States of America and Secretary of Agriculture,* Stockyards Case, 304 U. S. 1, 58 S. Ct. 773, 82 L. Ed. 1129.

The Commission may have before it at this hearing as evidence the report and findings of the wage board and anyone interested in the question, as an employer or employee in the industry, may appear and testify, or produce other competent witnesses to testify as to the matters involved. It appears from Sections 3 and 12 of the Act that such witnesses should be sworn and testify under oath. A record of their testimony must be made and preserved by the Commission. This is necessary since reviews by the court provided in Section 12 must be made upon the evidence and testimony as taken before the Commission.

After such hearing the Commission must determine if the wages paid in the industry are below the minimum prescribed by the law; whether the hours of labor in the indus-

try are longer than prescribed by law; and whether the standard conditions of labor are such as to be prejudicial to the health, morals or welfare of the workers. If the Commission determines that as to either of these the law is being violated it may then determine in proper findings, based upon the evidence before it, what the minimum wage in the industry should be in dollars and cents, based upon the yardstick fixed in the Act, that it be such sum as is adequate to supply the cost of proper living; what the maximum hours of work in the industry should be measured by the yardstick, that they must not be so long as to be prejudicial to the health, morale or moral attitude and welfare of the workers. It may also determine in its findings from the evidence the standard conditions of labor which should exist in the industry, trade, or occupation to safeguard the health and welfare of such employees. If the facts so found warrant, the Commission makes a mandatory order specifying the minimum wage in dollars, the maximum hours, and the standard condition of labor to govern the industry, trade or occupation. This relieves each employer in the industry from himself determining these things and taking the chance that his judgment is wrong. He is in a position like a driver on the highway, where the law says the speed must be reasonable and safe. If he relies upon his own judgment as to what is reasonable and safe and his judgment is in error, he may be held to answer.

What we have said above disposes of objections 1, 2, 3, and 4 as made to Mandatory Order Number One, adversely to plaintiffs. Objections 5 and 6 will be considered together as they both strike at the same matter, as to whether plaintiffs have had an opportunity for a hearing as required by the "due process clause" of the Constitution. "Due process" was defined by Mr. Justice Field, in *Hagar* v. *Reclamation District*, 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569. He said [page 667]:

"It is sufficient to observe here that by 'due process' is meant one which, following the forms of law, is appropriate to the case, and

just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought. The clause in question means, therefore, that there can be no proceeding against life, liberty, or property which may result in the deprivation of either, without the observance of those general rules established in our system of jurisprudence for the security of private rights."

After quoting the above statement, in *Argyle* v. *Johnson,* 39 Utah 500, 118 P. 487, this court said [page 490] :

"In giving legal effect to the foregoing principle in cases like the one at bar, it is not necessary that a hearing be had at any particular stage of the proceeding by which rights may be affected, or that the hearing be had before a regularly constituted court of justice; but it is necessary that a hearing be given at some time, and that the same be had before some officer, tribunal, board, or court to whom the person whose property is affected may present his evidence, objections, and arguments, to the end that the officer, tribunal, board, or court may be enabled to fairly and intelligently pass upon and determine the questions presented for decision."

Were the plaintiffs accorded a hearing that constitutes "due process" before the issuance of Mandatory Order Number One? Even a casual inspection of the record reveals that no such hearing was had; that there was no public hearing as required by law, and the Commission therefore acted in excess of its jurisdiction. The record reveals that a public meeting was held at the capitol pursuant to notice, and the opponents and proponents were allotted three hours each to talk about the matters. No witnesses were sworn; no record made of their statements; and as far as the proponents were concerned none of them appeared to be either employers or employees, or in any way connected with the retail trades or familiar with the questions under discussion. It appears to have been a public meeting and not a public hearing; a case of "we should" or "we should not" instead of a presentation of facts on the questions up for hearing. It appears to have been primarily a meeting which

might reflect public sentiment rather than a hearing where testimony under oath is taken and preserved in the record as mandatorily required by the act.

What is the essential quality of the proceeding under review and what is the nature of the hearing prescribed by the statute? The proceeding is one before an administrative board, not in the ordinary administration of purely executive duties, but a proceeding of a regulatory or quasi judicial trend or nature. The order which resulted is in its nature factual and declaratory. It is in some aspects much similar to a rate making order. The Commission as the administrative agent of the state in fixing the wages or hours in definite terms must make them under the terms and in harmony with the conditions and standards prescribed by the legislature. The legislature has required the Commission to determine that *wages being paid in the industry are inadequate to proper living; or that hours of employment are so long as to be dangerous to health or general welfare of the workers; or that the standard conditions of labor are against the general welfare or health of the employees.* If it so finds then it may determine and prescribe a minimum wage, maximum hours; and general standards or conditions under which employees shall labor. Such duty, such power, is vastly different from the ordinary administrative or executive function or duty. Being such, it carries with it fundamental requirements of procedure. There must be a full and public hearing. There must be evidence sufficient to support the necessary findings of fact. And nothing can be treated as evidence which is not such. *United States* v. *Abilene & Southern Railway,* 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016; *Garfield Smelting Company* v. *Industrial Commission,* 53 Utah 133, 178 P. 57; *Rockefeller* v. *Industrial Commission,* 58 Utah 124, 197 P. 1038. Facts and circumstances which ought to be considered should not be excluded nor should matters or circumstances which should not be legally pertinent be considered. The Commission is not bound by technical rules

of evidence but that does not mean that they may dispense with evidence, or act upon matters which are not evidence. As an aside, we remark that the record contains perhaps 200 letters to the Commission from divers parties urging or opposing the action taken. While the Commission filed them and certified them to us along with the record, most of them are in no sense evidence and we conclude that the Commission did not consider them and was not influenced thereby. Findings must be made by the Commission and must embrace the facts which are needed to sustain the order. *United States* v. *Abilene & Southern Railway,* supra; *Florida* v. *United States,* 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 291; *U. S.* v. *B. & O. Ry. Co.,* 293 U. S. 454, 55 S. Ct. 268, 79 L. Ed. 587; *Chicago Junction Case,* 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667; *Geo. A. Lowe Co.* v. *Industrial Commission,* 56 Utah 519, 190 P. 934; *Moray* v. *Industrial Commission,* 58 Utah 404, 199 P. 1023.

Such proceeding has been well described by Chief Justice Hughes in *Morgan* v. *United States,* 298 U. S. 468, 56 S. Ct. 906, 80 L. Ed. 1288, in which he says [page 911] :

"A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a quasi judicial character. The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The 'hearing' is the hearing of evidence and argument. If the one who determines the facts which underlie the order has not considered evidence or argument, it is manifest that the hearing has not been given."

The record further discloses that no findings of fact were made by the Commission upon which to base any order. The Commission seems to have proceeded on the theory

that the wage board fixed the wages, the hours, and conditions of labor, and the Commission merely determined at a public meeting whether or not public sentiment supported the action of the wage board.

The legislature in requiring a full and public hearing had regard to judicial standards—not in a technical sense but in regards to fundamental requirements of fairness,—that one shall hear before one condemns, and that judgments shall be based on evidence—which are the essence of due process in a proceeding of a judicial nature. Maintaining of proper standards by administrative agencies charged with quasi-judicial or quasi-legislative functions is of the highest importance and in the interest of the agency itself. Thus only can it maintain the confidence and respect essential to a proper performance of its duties. For these agencies, which necessarily multiply in our complex society,—to serve the purposes for which they are created and endowed with such vast power, they must accredit themselves by acting in harmony with the inbred concepts of fair play and the cherished traditions of a cautious, deliberate and judicious determination of the questions affecting people's rights or liberties.

No public hearing as provided by law having been had and no testimony having been taken or preserved at the public meeting, and no findings of fact having been made by the Commission upon which to base or predicate the order, it follows that the Commission exceeded its authority in issuing Mandatory Order Number One and the same is therefore void.

The brief attacks also that part of Mandatory Order Number One which provides:

(12) "Every employee who is discharged without one week's written advance notice shall be paid one week's salary at the time of dismissal, provided that this rule does not apply in the case of an employee who has been dismissed by reason of dishonesty or misconduct."

as beyond the power of the Commission because it prevents an employer from discharging an utterly incompetent em-

ployee or one in a case where there is strong evidence of dishonesty, without the employer being penalized one week's pay. While there may be grave doubts as to the Commission's authority to make a rule as quoted, we do not deem the question within the issues presented by the record here and so do not pass on the point.

The cause is remanded to the Industrial Commission for further proceedings in conformity with the views herein expressed.

FOLLAND, C. J., and HANSON and MOFFAT, JJ., concur.

WOLFE, Justice (concurring specially).

I am concurring specially because my approach to the results of the court's opinion and the conclusions upon which those results rest differ somewhat from the approach of that opinion. This opinion also attempts to set out with some definiteness the type of hearing which it is believed is required to satisfy procedural due process and where it may be placed in the procedure before the wage board and the Commission.

While I agree that the word "property" in its early meaning was not synonomous with "physical object" but meant a right in and to the object, I think it unnecessary in this case to attempt to define what is a property right as distinguished from a liberty. On the borderline where property rights and liberties meet there has been considerable controversy among writers of jurisprudence. It is not necessary to classify them at this time. That were better left until some case arises which requires that we definitely take a position.

It is unnecessary to determine whether in this case the right to enter into a contract, which includes the right to employ, is a property or an "economic right" or a fundamental liberty. With the conclusion that the due process clause has not been violated by the Minimum Wage Act, I can agree. With the restrictions on liberty set out in the

opinion I am in general accord. I conceive that persons living under organized government are thought of as having certain rights—call them property right or liberties, it makes little difference in this case that these rights change from time to time because economic and social conditions change. Rights or liberties which exist in one period are, because of the change in economic and social conditions, abridged or denied in a succeeding age. There is only comparative immutability in individual rights. They exist against the general background of public welfare and in relation to it and ultimately may, because of it, be abrogated or curtailed. As late as 1856 the case of *Wynehamer* v. *People,* 13 N. Y. 378, held that there was such property right in liquor as to prevent prohibition of its sale or disposition if obtained before the prohibitory act went into effect, a holding which practically nullified any attempts at liquor regulation. But the growth of the evils attendant on traffic in liquor awoke the conscience of mankind to the point where its more stringent regulation and finally its abolition were demanded. What was the legal phenomenon there illustrated? That as the evils of liquor increased and their consequences became more costly and more apparent, society, through legislation by exercise of what was known as the police power, attempted to curb them. The same was true of child labor. Time was when the liberty of contract permitted employers to engage for long hours children of almost any age. Finally the conscience of mankind spoke in reference to the horrors of this growing evil and its consequences. The liberty of contract was accordingly abridged. Likewise, when economic competition and economic conditions compel or permit employers to drive down wages, or when the ill-effects of continued low wages for women become insistent, the legislature is constrained by the aroused conscience of mankind to remedy that condition. If it were not for the ability of government to cope with situations like this, it must signally fail to perform the very purposes of its existence. It was the recognition of this

gradual change in the point of balance between a protection of the rights of individuals in the expression of their initiative and their energies and the similar duty to protect the members of society on which those energies impinged, that led us to say in *State* v. *Mason,* 94 Utah 501, 78 P. 2d 920, 925, 117 A. L. R. 330:

"This balance between police powers and due process is, therefore, more or less in a state of unstable equilibrium, changing with sociological and economic developments. As the protection of the due process clause recedes, the police power advances."

The next question not considered in that opinion which presents itself is whether there are any criteria to aid the courts in determining whether this balance has shifted in those cases where long and well established rights of contract are by legislation sought to be curtailed or abolished. In cases where social legislation purporting directly to touch the lives of many people—mass social legislation—impairs or does away with long recognized rights, are there any criteria by which the courts may be guided in determining whether the due process clause any longer stays the application of the police power? This being a concurring opinion and therefore not authoritative, I may be permitted greater liberty in the expression of ideas which at their best present only a partial and perhaps tentative contribution to this particular field of the law.

While the words "shall not deprive any person of liberty or property without due process of law" are as definitely restrictive *in expression* as the restrictions against denying the right of free speech and other civil rights, they obtain their real and only force from the meaning which is given to the words "due process of law," a phrase which has defied definition except as it is given content according to its application to the particular concrete situation with reference to which it is invoked. Even the more specific and definable restrictions of the Constitution which have a fair degree of fixity of meaning are susceptible of controversy

as to their application or the extent of it to various concrete situations. But "due process of law" is so indefinite as to amount to mere rhetoric until it is invested with meaning. The meaning with which it was invested has depended largely on the social or economic philosophy of those judges and legal writers who gave it meaning. In general, resort will have to be had to the rule of inclusion and exclusion so well expressed in *Davidson* v. *New Orleans*, 96 U. S. 97, 24 L. Ed. 616, as follows [page 104] :

> "But, apart from the imminent risk of a failure to give any definition which would be at once perspicuous, comprehensive, and satisfactory, there is wisdom, we think, in the ascertaining of the intent and application of such an important phrase in the Federal Constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded."

The task remains, however, of seeking in this type of case some basic criteria to guide us in determining whether particular cases should be excluded from the protection of the due process clause or included in it.

In the course of social change, and in the very nature of the social processes, we may expect, in the future as in the past, times to arrive when there will be a demand for reforms which, for their effectuation, will require the curtailment of rights or liberties thitherto held as protected by the due process clause. When this demand becomes insistent enough, legislative action will result. Then, under the assumed power of the judiciary, it is for the courts to say whether the legislature has exceeded its power. And any such question must necessarily involve a balancing of the social effect of curtailing those established rights as compared to the supposed social benefits of the reform desired. Whether the due process clause should longer stay the application of the police power depends largely on which way the scales fall in this balancing of the effect of curtailment of the rights of one group of society as against the desired

benefits supposedly accruing to the other groups. I think such consideration certainly must enter into the problem.

The first question results: Is each judge who has the problem before him to use only his own opinion in making the comparison? If 'so, the decision will depend almost entirely on the predilections of the judge, his social philosophy, the breadth of his social experience, and his understanding of social conditions. In the last analysis, the opinion of the judge in this particular field of constitutional law will in any event largely depend on those factors. But I think the opinion as to constitutionality (which is another way of stating the problem as to whether the due process clause holds back the application of the police power) must not depend so directly upon the characteristics of each individual judge.

What causes the legislature to use the police power to abridge rights formerly enjoyed is presumably the imperative of social necessity calling for legislative action. For this reason the action of the legislature itself is a very strong indication that the balance weighs in favor of the reform. In a large measure there has already been accorded a due and ample process of the law when the legislature has acted. The processes of the law certainly have been in large part properly and duly exercised.

We remind ourselves that the phrase "law of the land" used in the Magna 'Carta which Lord Coke said signified "due process of law" was meant to require the king to recognize that his will alone was not law (McKechnie's Magna Carta, Page 439), that all law did not reside in himself but consisted of the "Old English Code of customary law, subject to such changes in that code as the results of the Conquest had brought about" Taylor, Due Process of Law, Page 2. It was never meant to limit the power of the law making body which at the time of the Magna Carta consisted, such as it was, largely of the Barons and the Clergy. The Barons did not mean to curb their own power. *Hurtado* v. *California*, 110 U. S. 516, 4 S. Ct. 111, 292, 28 L. Ed. 232. And

in spite of Coke's words in Bonham's Case, 8 Coke, 118A, Taylor, Due Process of Law, Page 18, the common law never did nor was meant to control Parliament. "The omnipotence of parliament over the common law was absolute." Taylor, Due Process, Page 16. The Law of the judges was "subordinate legislation; carried on with the assent and subject to the supervision of Parliament." Dicey, Law of the Constitution, Page 58.

When the states gained their freedom from England their constitutions contained the due process clause. Since they had been subject theretofore to written instruments, royal charters and proprietory grants—which limited the power of their law making bodies, the due process clause or its equivalent the "law of the land" contained in some of the early constitutions was construed not only as insuring the liberties of English people gained up to and through the revolution of 1688 and existing at the time of severance, but also as binding on the legislatures. With the adoption of the written constitutions of 1776 the typical English state in America reached "its full growth," Taylor, Due Process of Law, Page 252. But the idea that rights of contract had, by the due process clause, gained the status of absolutism rather than existed relatively to the general welfare, is indigenous to American judicial soil and of comparatively recent origin.

As a reaction from that doctrine and by way of watering down the doctrine of judicial supremacy the liberal dissenters on the Supreme Court of the U. S. have stood at about the point where they hold the due process clause protects only against legislation clearly unreasonable, arbitrary and unfair. But as to mass social legislation which interferes with established and existing rights, no criteria seem to have been consciously developed for determining the point at which legislation, although in a previous day clearly unconstitutional, may now be upheld.

But under our system of judicial supremacy, one cannot be deprived of liberty or property merely by following cor-

rect legislative processes. Such processes do not in themselves entirely serve the demands of "due process." Due process of law as used in state constitutions has been construed as a leash on the police power. But the leash is not of a fixed length. There must be, in case of a law abridging or abolishing rights for the avowed purpose of social protection, a social necessity grave enough to call for the legislative action. It is the imperative of this social necessity calling for legislative action which makes that action due process. The problem is, therefore, in this field shifted to one of ascertaining the method of determining whether the social necessity is grave enough to warrant the legislature in depriving or abridging rights theretofore recognized. One large factor, as said before, is the fact that the legislature has acted. That presents a strong presumption of the social imperative. But under our system of government it is not an irrebutable presumption. The social imperative for the change should be evidenced also by a crystalized enlightened public opinion which legislative action is supposed to reflect. When the need of reform becomes great enough that crystalized public opinion concludes that it were better to curtail the rights of some, with its attendant individual hardships and social effect, in order to effect a reform considered of greater moment, the legislature under pressure of such opinion takes action. It is this fair, informed, and enlightened public opinion which the judges should take into consideration, in case of any doubt as to whether the legislature acted under social compulsion in changing the economic and social equilibrium from the old point of balance which existed under the enjoyment of the thitherto established rights to a new one resulting from the curtailment of those rights with the resultant protection or creation of new rights in another group of society. And enlightened public opinion means, among other things, opinion not actuated by self interest except as that self interest is bound up with the good of the whole. It is true that unless the judge has power to lay aside his social philosophy and predilections he will

usually judge such enlightened public opinion to be according to such predilections, but at all events the criterion allows, if his mind will permit it, a factor to enter into the processes of his reasoning which does not entirely depend on his personal viewpoint concerning the reform. Indefinite as this criterion is, there may be none more definite in this changing world. Legislatures may not, without translating into law the mere transitory vagaries of the electorate, too far precede this opinion nor lag too far behind it without endangering the very foundations of the state. This indefiniteness exists by necessity. It is part of the indefiniteness necessarily introduced into the due process clause itself when it was given a construction which made it apply to the protection of substantive rights as distinguished from and independently of any assurance of fair procedure in the doing away of those rights. Under the theory that due process froze a right and insured its existence for all time, there was introduced the conception of due process as having a function distinct from the assurance of fair procedure. But with recession of the theory that rights had, because of the due process clause, gained the status of a sort of absolutism—a conception peculiar to American constitutional law and of comparatively recent origin—and with the recognition that all rights were relative and subject to change with the march of social progress, there arose the intermediate conception that substantive due process was only a guarantee against the impairment or abolition of those rights before the time when social necessity required it. And in a sense this was itself a sort of procedural due process—not the procedure which was thought of as requiring fair play in method but a social process imperceptible and inexorable in its advance.

Assuming that the framers of the Constitution had in mind substantive as well as procedural due process, it were as if they had said:

"We recognize today that men have certain rights to be protected until the exercise of such rights under changing economic and social conditions may endanger society or a substantial portion of it. We

cannot tell when that time will come. We must leave it to the future to determine. But we admonish the legislature not to interfere with those rights until social necessity requires it."

The action of the legislature in interfering with such rights itself presents strong evidence of that social necessity, and the court should not overturn such action, unless it is convinced without any reasonable doubt that the social exigencies which purport to make the legislation necessary do not in fact exist. And if there is any crystalized enlightened public opinion which supports the conclusion that the exigencies exist, the court should take that into consideration as evidence that the legislature acted in response to a social imperative even though the judge himself may not believe or has doubt as to the necessity. Enlightened and crystalized opinion is to the issue of constitutionality of a law abridging or denying rights as substantial evidence is to an issue of fact. True it is that judicial minds may differ as to the existence, nature, or extent of crystalized opinion, but this extraneous standard, indefinite as it is, is better than the self-contained ipso dixit opinion of the judge himself. While his personal opinion may be part of the enlightened public opinion, it is at the most only his opinion. He must look beyond his own preconceptions and his own opinion in determining whether the thrust of informed public opinion makes an advance of the police power on the protection of the due process clause necessary. This criterion of social necessity evidenced by enlightened public opinion presupposes experience and knowledge by the holders of such opinion of conditions from which it is deduced. It is presumed that the legislative act was passed in pursuance of the demands of such public opinion, and with due regard to the balance between the benefits of the reform supposedly inaugurated and the consequences to that group at whose cost the reform was made. The determination of the question of whether the situation is such as presents a case where informed and disinterested public opinion has concluded that the public welfare demands that rights formerly recognized

be abridged or denied, depends on the opinion of the majority of the judges on the court and is, therefore, subject to that extent to human judgment and fallibility. So in the last analysis do all opinions of the court depend on the individual judgment of the men who constitute the court. That is only saying that all human institutions depend on the workings of the human mind and fundamentally can rise only as high as these human minds which direct them. The only assurance possible is to procure for judging positions those capable of judging. Only to that extent are the rights and liberties of citizens and the protection of society assurable.

This conception of the point at which the police power is held in check by the due process clause steers a course between the sophistry which contends that rights are fixed or immutable and not to be determined in relation to the public welfare and the idea, rejected under our system, that the legislature itself is the sole judge of the extent of the police power. Perhaps the reversal of the Adkins Case, *Adkins* v. *Children's Hospital,* 261 U. S. 525, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238, by the Parrish Case may be explained not so much in terms of error in the first case rectified by the second case as by a change in conception of the nature of private rights in relation to the public welfare; and therefore in terms of a change of personnel in the court only in so far as such changed personnel reflected the conception that the real criterion which should guide the court in its determination whether the police power permitted abridgment of the absolute right to employ women at such wages as one could get them for, was the enlightened public opinion as to the need of doing so. While the decision of the Supreme Court of the United States is not binding on us in this regard, it is highly persuasive that in this state the police power extends to protect women engaged in industry in such fashion. It is persuasive that the enlightened opinion of mankind has arrived at the point where it deems such legislation necessary in our competitive system to protect a large class of society.

It must be admitted that the upholding of the right of the legislature to pass minimum wage and hour laws presents a departure from the orthodox review of the private right of contract far reaching and decisive in its effects, both legally and economically. Whether for better or for worse only the future will reveal. A certain amount of cautious economic and social experimentation is necessary even though its consequences, while beneficial along some lines, may along others be detrimental. It is perhaps true as contended by plaintiffs that before the advent of minimum wage laws there has been a direct relation between the evils sought to be remedied in the conduct of the business and the public welfare. There is no attempt by the minimum wage law to regulate any practice in the conduct of the business itself which it is claimed directly impinges detrimentally on the public or the employee. It is not like a zoning law or a law regulating pool halls or dance halls, or one designed to require the employer to provide facilities for or desist from practices which affect the health and comfort of the employees. The raise in wages by the minimum wage law makes a money contribution to the welfare of a group. It provides more by which to live, and affects therein the lives of the workers which in turn affects the public welfare. Thus indirectly the business is supposedly contributing to the betterment of conditions. This is in keeping with the expanding idea of the responsibility of business to the public; with the idea that business is not something self-contained but a part of all society; that it is the numerator in one of a series of fractions all of which have the government as representative of society for their common denominator; that the integration of business with society demands that it be not sovereign in its field but that it serve the public both by the manner of its production and by making its contribution in the form of a living wage and thus become not only a profit making and goods producing or distributing agency but a vital factor in the upbuilding of a better society. It is to be admitted that the attempt to solve the social problem of the

underpaid woman in this manner raises other problems perhaps as serious or more serious. But this again presents a case for cautious social experimentation. We may be comforted by the fact that it does not seem where tried elsewhere to have the devastating consequences predicted for it. But because it is somewhat revolutionary and because all such measures require caution and circumspection in the manner of their introduction, I think it is not a correct realistic position to hold that the Commission need not consider the effect of the minimum wage on the businesses which pay it. While the statute makes the standard a wage which will maintain health and welfare and thus logically seems to ignore the element of ability to pay, I suspect that there was a hope which went with the legislation that between the low and the high figure of permissible variation of opinion as to the wage necessary properly to maintain health and welfare, the Commission would choose that figure which would not work too much hardship on the merchant and the class of employees who might fall under the axe of personnel reduction. Certainly a wage fixed high enough to kill the business which produced it would in the end aggravate the very situation it attempted to remedy. No-wage is an aggravation of low-wage, and no-wage cannot maintain the health and welfare of women and minors even as well as a low wage. No one would advocate that the wage be so low as to satisfy the marginal employer. If it should be so as to permit only the best advantaged employer to pay it, it may tend to monopoly and in that way affect our whole economic structure, for the problem is linked with that of the small merchant competing against the greater effectiveness of the larger merchant and chainstore. Profound matters of economic policy are so involved that the wisest administration is none too ample to permit of the necessary economic adjustments. And at the best, we must expect that the horizontal minimum over a whole industry while equal in level will operate unequally in particular situations and inevitably produce hardship. That perhaps is the price we must pay for the

ultimate desiderata, but the act must be administered so as to produce as few of these individual hardships as possible, consistent with producing the result desired.

The court's opinion states that the employer is, under the act, "not forbidden to employ anyone; not required to pay any set wage or to have people work any set number of hours." If he cannot pay the minimum for the maximum number of hours, the effect of the law is to prohibit him from employing anyone. I think the law does interfere substantially with the right of contract as he formerly enjoyed it, and I think it can be sustained only on the ground that it is a reasonable exercise of the police power which as above stated depends on whether the social situation the law is designed to accomplish is of sufficient moment to permit the pushing back of the protection of the due process clause so as to allow the police power to apply in that territory in which the employer was formerly permitted to operate without such interference. I see no reason to question the judgment of the legislature that the welfare of society will be sufficiently served by the legislation to lift the protection of the due process clause.

We have not the question of the reasonableness of the order before us at this time, but the question of constitutionality and correct procedure only. Whether the statute gives a right to have the reasonableness of the order tested out or, if it does not, whether it can constitutionally preclude the review is likewise not before us.

On the question of procedural due process: I concur in the conclusion that somewhere along the line opportunity must be given to the employer and employee and others interested to be heard. And that means not only to make speeches or to present agrument, but to present evidence. The structure of the act seems to be such as provides for an investigation by the wage board which may or may not involve an opportunity to present evidence; that there is nothing in the act which requires the wage board to take testimony. It evidently may obtain its data on the cost of living as it deems

best. The act provides that the Commission shall make rules and regulations governing the mode of procedure of the wage board, but there is nothing which compels the procedure to be such as will require sworn testimony to be taken by the board. Hence, at the coming in of the board's report, the industry has its first intimation of what the Commission has before it in the way of a finding or a recommendation. Then at the public hearing the opportunity for putting in evidence for and against the board's recommendation must be allowed. Otherwise, the Commission could make an order far reaching and drastic in its nature without the parties interested in or affected by the order having any opportunity to introduce any evidence on the reasonableness of the board's recommendations. Somewhere along the line the parties affected must be given an opportunity to be heard and adduce evidence on their behalf. The matter, as said Mr. Chief Justice Hughes in *Morgan* v. *United States*, 304 U. S. 1, 58 S. Ct. 773, 775, 82 L. Ed. 1129,

"goes to the very foundation of the action of administrative agencies intrusted by the Congress with broad control over activities which in their detail cannot be dealt with directly by the Legislature. The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the Legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,' essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process."

In the Morgan Case, unlike the case at bar, the examiner took evidence in making his investigation. The parties, therefore, had opportunity to present evidence. But after the examiner made his recommendation to the Secretary of Agriculture, the latter, without giving notice to the parties as to the recommendations, made his order fixing reasonable rates.

"No opportunity was afforded to appellants for the examination of the findings thus prepared in the Bureau of Animal Industry until they were served with the order."

In the words of Mr. Chief Justice Hughes:

"The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to *meet them*. The right to submit argument implies that opportunity; otherwise the right may be but a barren one." (Italics added.)

The very difference between the Morgan Case and the instant case illustrates the fundamental principles here involved. In the Morgan Case opportunity was given before the examiner to adduce evidence as to the proper charge for stockyard service. That case may be misunderstood to hold that the parties should have opportunity to adduce evidence after the claims of the government were made known. We do not so interpret it. The evidence was adduced by the examiner and was in the record, but no opportunity was given to the parties *to meet* the claims of the government by argument on the evidence already adduced to show that the findings were unreasonable. In the instant case no opportunity was given to introduce before the wage board evidence as to the proper wage to fit the standard laid down by the statute; therefore, the opportunity to do that must come after the recommendations. If the board had taken evidence, giving interested parties the opportunity to be heard, and submitted the record, in all probability the requirements of "fair play" would have been met by granting the opportunity to take exception to the recommendations, together with an adequate opportunity to argue the exceptions. Said Mr. Chief Justice Hughes in the Morgan Case:

"Congress, in requiring a 'full hearing,' had regard to judicial standards—not in any technical sense but with respect to those fundamental requirements of fairness which are of the essence of due process in a proceeding of a judicial nature. If in an equity cause, a special master or the trial judge permitted the plaintiff's attorney to formu-

late the findings upon the evidence, conferred ex parte with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing. The requirements of fairness are not exhausted in the taking or consideration of evidence, but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps."

The procedure may have been designed so far as possible to dispense with the necessity of employees' appearing and testifying contrary to their employers. Fear of losing their jobs on some trumped-up charge might keep them from testifying. But proof of cost of living of working women, wages paid, and cost of doing business does not need to be proved by testimony of the employees. At all events proper administrative procedure and procedural due process require that in matters as important and fundamental as fixing a wage which may, and in all probability will, affect a great area of business and many employees, opportunity must be given before the wage is fixed to present the position of those to be affected. After the wage is fixed, a rehearing can be had only on the ground that the Commission acted without, or in excess of, jurisdiction or the order was procured by fraud. On appeal the district court appears to have power to review the record only to see if the Commission acted without or in excess of its power or if the order was procured by fraud. Nowhere does the act expressly provide for any review as to the reasonableness of the order. Perhaps an unreasonable order might be beyond the power of the Commission to make. An order fixing a minimum wage for women is bottomed on an investigation which may not take the form of a judicial inquiry but on the wage board's investigation. Consequently, where the order affects fundamental rights and large numbers of employers and employees indiscriminately and is based, not on single issues dealing with a single employer such as the issues of accident, employment, status, dependency as in the compensation act, but on a composite conclusion as to the amount necessary to live decently and in

health, the necessity for procedure which will permit somewhere in the process a full hearing for those affected is imperative. In this regard it will be noted that the Industrial Commission Act recognizes this requirement and gives the employers a right to be heard as to the reasonableness of any order made by the Commission for the safety, comfort or health of employees. R. S. U. 1933, 42-1-1 et seq.

I have some question as to whether the plaintiffs should not at the public hearing have tendered evidence or offered to do so. Perhaps they felt it useless so to do after the Commission put a limit on the time for each side and treated the hearing as one merely for the expression of sentiment for or against the minimum wage. The importance of the case compels one to lean against the contention that plaintiffs had waived their rights by not insisting on them.

I also agree that the case presents no such delegation of legislative powers as would render it unconstitutional. A primary standard or guide is provided. The wage must be one "not less" than that adequate to supply women and minors the necessary cost of proper living. This must be construed to mean that wage which will provide the necessary cost of a proper living. The standard does not need to be mathematical or exact or one by which only one conclusion can be reached. The standard here provided is hardly less definite than in the case where the President was required to determine whether he deemed duties or other exactions imposed by other governments on United States products to be reciprocally unequal or unreasonable (*Field* v. *Clark*, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294) ; or the duty and authority to determine a reasonable rate (*St. Louis I. M. & S. R. Co.* v. *Taylor*, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; *Inter-Mountain Rate Case*, 234 U. S. 476, 34 S. Ct. 986, 58 L. Ed. 1408; *Avent* v. *U. S.*, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202; *New York Central Securities Corp.* v. *U. S.*, 287 U. S. 12, 53 S. Ct. 45, 77 L. Ed. 138) ; or the authority to grant licenses by the Radio Commission "as public convenience, interest or necessity requires" (*Federal Radio*

*Commission* v. *Nelson Brothers Company*, 289 U. S. 266, 53 S. Ct. 627, 77 L. Ed. 1166) ; or the application of the "flexible tariff provision of the Act of September 21, 1922 (42 Stat. 858, 941) as authorized in the President, (*Hampton & Co.* v. *U. S.*, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624) ; or authority on the part of the Secretary of Treasury

"Upon recommendation of a board of experts to establish uniform standard of purity, quality, and fitness for consumption of all kinds of teas imported in the U. S. (*Buttfield* v. *Stranaham*, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525) ; or the authority given to Secretaries of the Treasury, Agriculture, Commerce, and Labor to make rules and regulations permitting 'reasonable' variations from the legislative requirements that all packages of food be conspicuously marked in terms of weight, measure, or numeral count (*U. S.* v. *Shreveport Grain & Elevator Company*, 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175) ; or authority granted to the Interstate Commerce Commission to order acquisition wherever it should be 'of opinion, * * * upon application of any carrier or carriers * * * that the acquisition, to the extent indicated by the commissioner, by one of such carriers of the control of any other carrier or carriers * * * will be in the public interest" (*New York Central Securities Corp.* v. *U. S.*, 287 U. S. 12, 53 S. Ct. 45, 77 L. Ed. 138; Interstate Commerce Act § 5, 49 U.S.C.A. § 5).

As stated in the case of *Sears, Roebuck & Co.* v. *Federal Trade Comm.*, 7 Cir., 258 F. 307, 312, 6 A. L. R. 358:

"With the increasing complexity of human activities many situations arise where governmental control can be secured only by the 'board' or 'commission' form of legislation. In such instances Congress declares the public policy, fixes the general principles that are to control, and charges an administrative body with the duty of ascertaining within particular fields from time to time the facts which bring into play the principles established by Congress. Though the action of the Commission in finding the facts and declaring them to be specific offenses of the character embraced within the general definition by Congress may be deemed to be quasi legislative, it is so only in the sense that it converts the actual legislation from a static into a dynamic condition."

The legislature acted on the subject so far as reasonably practicable and from the necessities of the case was compelled to leave the Commission the duty of bringing about

the result pointed out by the statute. *Red "C" Oil Co.* v. *Board of Agriculture of North Carolina,* 222 U. S. 380, 394, 32 S. Ct. 152, 56 L. Ed. 240.

In *Hampton & Co.* v. *U. S.,* supra, 48 S. Ct. 352, it was stated:

"If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

The language applies in the instant case.

In *Cincinnati, Wilmington, etc., R. R.* v. *Commissioners,* 1 Ohio St. 77, 88, the court pointed out the distinction between

"the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law."

In this case the legislature definitely expressed its will that women in industry should be paid a wage to meet the cost of proper living. It left to the Commission the task of determining the facts on which the operation of the law was contingent and the further duty of determining the actual minimum wage which was to be found by applying the standard of the cost of proper living. In *Tite* v. *Tax Commission,* 89 Utah 404, 57 P. 2d 734, the Tax Commission attempted to exercise a judicial function in that it was left to the absolute discretion of the Commission to inflict different penalties for exactly the same offenses. When the Industrial Commission makes its order in this case, it will necessarily fit all persons falling under differentiable categories equally, i. e., all women working in the same industry or in the same category. The consequences of course will not be the same on all employees or businesses, but neither would the consequences of the fine for speeding if applied to a rich as compared to a poor person be the same.

The wage board made no differentiation between the cost to maintain women in proper health and welfare and that to maintain minors in that condition,—nor between such cost in one locality as compared with others. Complaint was made of failure to do so. In the public hearing herein ordered, opportunity will be afforded to the interested parties to make a showing in that respect if they be so minded. For the reasons set out above I concur.